Stevie L. PATTON, Appellant,

v.

UNITED STATES, Appellee.

No. 91–CF–826.

District of Columbia Court of Appeals.

Argued Jan. 27, 1993.

Decided Nov. 22, 1993.

802

Derek Sells, Public Defender Service, with whom James Klein, Jo-Ann Wallace and Robert Hurley, Public Defender Service, Washington, DC, were on the brief, for appellant.

Steven J. Durham, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty. at the time the brief was filed, and John R. Fisher, Thomas J. Tourish, Jr., and June M. Jeffries, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before FERREN and STEADMAN, Associate Judges, and PRYOR, Senior Judge.

PER CURIAM:

Following a jury trial appellant was convicted of two counts of first degree murder while armed, in violation of D.C.Code §§ 22–2401, –3202 (1989). Prior to trial, appellant moved to suppress several statements that he made to police and certain physical evidence. A hearing was held on appellant's motion, after which the trial court denied the motion. Appellant challenges the denial of his motion to suppress, the admission of assertedly inadmissible hearsay at trial, and the sufficiency of the evidence as to premeditation. We conclude that inadmissible hearsay was admitted at trial, resulting in unfair prejudice to appellant, and, therefore, we reverse the judgment of the trial court and remand for a new trial. We reject appellant's other arguments.

I.

On October 29, 1989, Officers Kevin Flemens and Shawn Braxton of the Metropolitan Police Department were on patrol in a marked police cruiser. At approximately 4:55 a.m., they saw appellant running down the street and yelling to them. Appellant, who was breathing heavily, highly emotional, and bleeding from a severe cut on his left hand, approached the police car and informed the officers that there had been a stabbing in a nearby apartment. Appellant then entered the car and directed the officers to the apartment. Officer Flemens radioed

for an ambulance, and when appellant and the officers arrived at the apartment, Officer Flemens instructed Officer Braxton to stay with appellant while Officer Flemens went inside. Officer Braxton testified that he was concerned at that point that appellant might pass out due to a loss of blood. Officer Carter Adams and several other officers also arrived at the scene during this time.

Officer Flemens testified that when he first entered the apartment, he saw blood on the knob of the television in the living room, some blood on the living room carpet, and a bloody towel between the living room and the hallway. He went down the hallway to the bedrooms and saw a baby sitting on a bed, and in the same bedroom found a woman with multiple stab wounds lying face down on the floor. In the adjacent bedroom, he found a young girl, also having suffered multiple stab wounds. Both were dead at the time that Officer Flemens found them.

Officer Braxton testified that because appellant was a potential witness to the events that had taken place in the apartment, he accompanied appellant to the hospital in the ambulance. Officer Braxton also testified that he never placed appellant under arrest or restrained him in any way, and that appellant never objected to his presence. A uniformed police officer transported appellant to the homicide office at approximately 10:10 a.m., after appellant's examination at the hospital was completed.

Detective Dwayne Stanton took appellant into an interview room at the homicide office and explained that appellant was not under arrest, that he was free to leave at any time, and that he only wanted to ask appellant a few questions, but that appellant did not have to answer any questions if he did not want to. Detective Stanton then gave appellant a modified PD–47 to read and initial. The modification added the word "not" to the statement "You are [not] under arrest." In

addition, Detective Stanton also read the PD–47 aloud to appellant. Appellant wrote "yes" next to each question on the waiver side of the PD–47,[1] and signed and dated the bottom.

Detective Herman Johnson joined Detective Stanton and they proceeded to interview appellant. During that interview, the detectives asked appellant if they could take his clothes in order to run some tests on them; appellant agreed and relinquished his clothing. Later, Detective Roger Hearron came in and replaced the other detectives in the interview room. Detective Hearron interviewed appellant and then accompanied appellant when he went outside to meet his father.[2] After they returned to the homicide office, Detective Young, the officer in charge of the investigation, arrived from the crime scene and about six hours after appellant's arrival at the homicide office, placed appellant under arrest. He showed appellant an unmodified PD–47, which appellant signed and dated, again answering "yes" to each question. Appellant then repeated his story to Detective Young.

According to appellant's account as given at trial, when he arrived home on October 29, 1989, to the apartment that he shared with Brenda Sams, her niece Kianna Sams, and his son Tory, Brenda was lying on the floor and a man named Jesus, to whom appellant owed money for a drug debt and who had harassed appellant and his family in the past, was standing over Brenda with a knife. Jesus tried to stab appellant with the knife and appellant grabbed at the knife in defense. The two men got into a struggle and appellant was thrown into a piece of furniture. He hit his head, and although never unconscious, was afraid to move. When Jesus left, appellant got up and ran down the street towards his mother's house, from where he intended to call the police. As he was run-

---

1. A PD–47 is a standard form used by the Metropolitan Police Department with the following questions: 1. Have you read or had read to you the warning as to your rights? 2. Do you understand these rights? 3. Do you wish to answer any questions? 4. Are you willing to answer questions without having an attorney present?

2. Detective Hearron testified that he accompanied appellant outside at appellant's request. Appellant testified, however, that he made no such request and that Detective Hearron had insisted on accompanying him outside when he went to meet his father.

ning down the street, he flagged down the police car for help.

The government's theory at trial was that appellant had fabricated the entire story about Jesus and had actually committed the murders of Brenda and Kianna Sams himself. The government asserted that appellant had lied about the actions that he said that Jesus had previously taken against appellant and his family. Detective Johnson testified that he spoke with appellant's mother on the telephone during the time that appellant was being interviewed at the homicide office, and that she had denied that the events appellant had related had ever taken place. The government argued that as the stories of the previous events were false, so too, was appellant's story relating to the murders.

## II.

Appellant contends that the trial court committed reversible error in allowing two police detectives to testify about the hearsay content of a telephone conversation one of them had with appellant's mother. The government denies that the challenged statements were inadmissible hearsay, arguing that the evidence was offered not for its truth but for its relevance to the police investigation and arrest. The government says, more specifically, that the statements were offered to show appellant's reaction during a police interview to information, attributable to his mother, that contradicted the account he had given to the police earlier.

We reject the government's contention for the following reasons. First, through its opening statement to the jury and otherwise, the government presented the challenged statements for their truth; the mother's hearsay was used to impeach the son's testimony in four instances. Second, as to the mother's two most damaging statements, the detectives neither elicited nor reported appellant's reactions; the government's contention as to those statements is altogether unsupported by the record. Third, the mother's other two, less damaging statements arguably could have been admitted for the purpose (impact on investigation) the government invokes, not merely for an improper hearsay purpose; the prosecutor did elicit appellant's reactions to these statements from the testifying detective. But, the government and the trial court—not the defendant/appellant—had the burden, upon objection, of justifying admissibility under a specified exception to the hearsay rule and of providing the jury with a proper limiting instruction. That was not done here; in fact, the prosecutor and the trial court, when confronted by defense counsel, did not even acknowledge there was a hearsay problem. Thus, absent a limiting instruction, these two statements also were inadmissible hearsay received in evidence for their truth. Finally, because the case against appellant was wholly circumstantial and the government's evidence was far from overwhelming, the admission of the prejudicial hearsay—a mother, in effect, calling her son a liar—was not harmless error.

## A.

Appellant's mother, Eloise Patton, testified early in the trial as a government witness. She described events that occurred at her home during a visit by appellant and Brenda Sams on the night of the murders. In particular, she testified, appellant had taken a butcher knife into a bedroom, alone, and said he was "tired of living"; the two women had coaxed him out, with Sams saying, "Stevie, we love you"; appellant had come out after about ten minutes and had given Brenda Sams the knife; the three of them had "had a little prayer"; and appellant then had left the house. Ms. Patton added that Brenda Sams left her house fifteen or twenty minutes later. She also testified that appellant had returned to her door fifteen or twenty minutes after Sams had left but that she had not let him in. On cross-examination, Eloise Patton testified that there had been no fighting or even an argument between appellant and Brenda Sams.

Eloise Patton's testimony was not impeached. Moreover, she did not testify about several other matters later attributed to her in the trial testimony of two detectives. In particular, she did not discuss whether appellant was employed at the time of the murders. She also did not mention

Jesus or any of the incidents involving him. Appellant contends that these statements attributable to Ms. Patton by the detectives were inadmissible, prejudicial hearsay.

More specifically, four days after Eloise Patton testified, Detective Stanton testified for the government about his interview with appellant at the homicide office the day after the killings. Stanton testified that appellant discussed his visit to Eloise Patton's house with Brenda Sams. According to Stanton, appellant said that Sams left before he did but that he came back about fifteen minutes after he left the first time and that Ms. Patton did not let him in. Stanton further testified that at one point during the interview his partner, Detective Johnson, left the interview room to call Eloise Patton. According to Stanton, Detective Johnson soon returned and began to tell appellant what Eloise Patton had said on the telephone. Defense counsel objected to this testimony, arguing hearsay. The trial court called a bench conference and asked whether Detective Johnson would testify at trial. When the prosecutor assured the court that Johnson would testify, the trial court overruled defense counsel's objection.

Detective Stanton then testified that Detective Johnson had told appellant about two statements by Eloise Patton, both of which contradicted statements appellant had made during the interview. According to Stanton, Johnson told appellant that Eloise Patton had said appellant left her house before Brenda Sams did. Stanton also testified that Detective Johnson told appellant that Eloise Patton had contradicted appellant's statement that he was employed. Stanton indicated that after Detective Johnson gave appellant this information about his mother's statements on the telephone, appellant changed one aspect of his account but reaffirmed the other portion. Stanton testified:

> I believe [appellant] said he left first and then Brenda left. And he said that his mother must not have understood our question about his employment, because he was, indeed, employed for this company in Bethesda or Chevy Chase.

Detective Stanton also testified that later, during the same interview, appellant said that Jesus had broken into Eloise Patton's house sometime before the murder and had thrown an automobile transmission through someone's car window. Stanton could not remember if appellant had specified whose car it was. Stanton further testified that Detective Johnson then told appellant that Eloise Patton had denied knowledge of those incidents. No one asked Detective Stanton how appellant had reacted to Detective Johnson's report of Eloise Patton's denials.

After a lunch break, defense counsel clarified for the record that he "had a standing objection to" the hearsay. The trial judge suggested that he could "go through a whole dissertation about why [he doesn't] believe it's hearsay," concluding that "certainly if [Detective Johnson] testifies, there is no prejudice from [an] erroneous ruling on that."

Later that afternoon, Detective Johnson did testify. He said that appellant had provided Eloise Patton's phone number so that Johnson could call her to check appellant's statements. Corroborating Detective Stanton's testimony, Johnson testified that he told appellant Eloise Patton had said that appellant had left her house before Brenda Sams did and that appellant was unemployed. Detective Johnson also testified that during the interview appellant said "Jesus had thrown an engine or a transmission through the windshield of [Eloise Patton's] car." Johnson added that appellant also said during the interview that Jesus had broken into Eloise Patton's house because appellant owed Jesus some money. Detective Johnson further testified that he told appellant Eloise Patton had contradicted appellant's claims that Jesus had broken into her house and thrown a transmission through her car window. Again, no one asked the detective how appellant had reacted to these statements.

## B.

The government asserts that Eloise Patton's statements to Detective Johnson were *not inadmissable hearsay* because they were offered in evidence not for their truth but to describe appellant's reactions during the po-

lice investigation to information that contradicted his statement to the police.

It is apparent that the trial court did not believe the statements were hearsay, but not for the reason the government advances on appeal. Two levels of hearsay are involved: (1) Detective Stanton's testimony about what Detective Johnson said, and (2) both detectives' testimony about what Eloise Patton said. Although defense counsel objected to all hearsay, the trial court focused only on the first level (Stanton's testimony about Johnson), found there was no hearsay (without explaining why), and added there could be no prejudice from an erroneous ruling because Johnson himself would testify (and presumably confirm what Stanton said Johnson had said). The trial court never explicitly ruled on whether the second level (the detectives' testimony about Eloise Patton) was hearsay. The government, therefore, never had to argue at trial any theory of admissibility, as it does on appeal. It offers now the only possible theory: that the testimony was admissible for a purpose other than the truth of the statements attributed to Eloise Patton. For the reasons that follow, the government's argument fails.

"Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered to prove the truth of the matter asserted." *Little v. United States,* 613 A.2d 880, 882 (D.C.1992) (quoting FED.R.EVID. 801(c)) (internal quotations omitted); *see also Jenkins v. United States,* 415 A.2d 545, 547 (D.C.1980). Hearsay evidence is generally not admissible at trial, unless it falls under one of the "exceptions to the hearsay rule that provide for the admission of statements because they exhibit certain indicia of reliability that overcome or outweigh the normal risks associated with the inherent dangers of hearsay statements." *Laumer v. United States,* 409 A.2d 190, 194 (D.C.1979) (en banc).

This court has recognized that out-of-court statements are not hearsay when they are offered only to show their effect on the listener. *See Goldsberry v. United States,* 598 A.2d 376, 380 (D.C.1991) (notice advising appellant of time and place of trial, signed by appellant and witnessed by deputy court clerk, was admissible to show appellant had notice of next court appearance date); *Grant v. District of Columbia,* 597 A.2d 366 (D.C. 1991) (statement that appellant's daughter had come to door requesting matches for her mother was admissible to show not that mother needed matches but that daughter was not where appellant had testified she was); *In re C.D.,* 437 A.2d 171, 175 (D.C. 1981) (statement to appellant to go outside and keep watch was admissible to explain and show motive for appellant's subsequent conduct); *Jenkins, supra,* 415 A.2d at 547 (statement of court clerk that appellant's case had been dismissed admissible to show reason for his belief that he did not have to appear at trial).

■ In this case, however, contrary to the government's assertion, it is clear that Eloise Patton's statements to Detective Johnson were offered not primarily to show their effect on appellant but to prove the truth of the matters asserted. This case closely resembles *Carter v. United States,* 614 A.2d 542, 544–45 (D.C.1992), in contrast with the cases cited above. In *Carter,* this court held that a police officer's testimony about a telephone call from appellant's wife or girl friend concerning ownership of the car in which appellant was found was "patent hearsay." *Id.* The government had argued that the statement of the woman on the phone was not offered to prove the truth of the matter asserted because it merely undermined appellant's credibility by impeaching his testimony that the car belonged to someone else. This court's conclusion in *Carter,* rejecting the government's argument, applies here as well:

> If what the woman said was not true, then her statement had no probative value because it could not have impeached appellant's testimony. Thus the impeachment value of the statement depended on its truth, and that fact made it hearsay. Since it did not fall within any of the recognized exceptions to the hearsay rule, it was inadmissible.

*Id.* at 545. In the present case, without question, the government relied on the truth of Eloise Patton's statements to impeach appellant's testimony to the contrary.

The prosecutor's opening statement at trial made that clear. In summarizing the evidence to be presented, the prosecutor recounted the version of the killings that appellant had given to the police; the prosecutor then indicated that Eloise Patton had made statements to the police that contradicted appellant's account—clearly attempting to undo appellant's story with a contrary truth. The prosecutor said to the jury: "At one point Detective Johnson went and called Mr. Patton's mother and got some information from her *that was different from what Mr. Patton said,* and [appellant and the detectives] had further conversations." (Emphasis added.)

Furthermore, the record does not support the government's contention on appeal that the prosecutor introduced Eloise Patton's statements primarily to show appellant's reactions to them when the police confronted him during the stationhouse interview. It is true that, at one point in Detective Stanton's testimony, the prosecutor asked about appellant's response to Detective Johnson's report on two of Eloise Patton's statements. Stanton's testimony indicated, moreover, that appellant changed his story when he learned that his mother had contradicted his earlier statement that he had left her house before Brenda Sams did. But he steadfastly maintained that he was employed; his mother, he said, had been mistaken about that. Detective Johnson himself, however, was not asked to comment on appellant's reactions to Eloise Patton's statements. Furthermore, contrary to the government's theory of admissibility, neither detective referred to any reaction appellant may have had to Detective Johnson's report that Eloise Patton had contradicted two of appellant's comments about Jesus, the man whom appellant implicated in the killings. Only once, therefore, with respect to two of Eloise Patton's alleged statements, did the prosecutor elicit testimony from the detectives that suggested a reaction from appellant.

On this record, we cannot conclude that the government offered Eloise Patton's statements primarily to demonstrate appellant's reactions to them; they were presented—fundamentally—for the truth of the matters asserted to impeach appellant's credibility.

## C.

The government suggests, nonetheless, that Eloise Patton's statements were not hearsay if they were admissible for any proper purpose (*i.e.,* for appellant's reactions), even if they also could have been used for an improper purpose (*i.e.,* for their truth). Because two of Ms. Patton's four out-of-court statements demonstrably were used, albeit only once, to show their effect on appellant, the government argues that defense counsel had the burden of asking the trial court to protect against improper use of the statements by giving a limiting instruction to the jury.

▮ We agree that in general, when evidence is admissible for one purpose but not for another, "[t]he interest of the adversary is to be protected, not by an objection to its admission, but by a request at the time of the offer for an instruction that the jury is to consider the evidence only for the allowable purpose." 1 JOHN WILLIAM STRONG, McCORMICK ON EVIDENCE § 59, at 236 (4th ed. 1992) (footnote omitted). But this presupposes that the adversary knows the "allowable purpose." In this case, the trial court, in ruling that the statements were not hearsay, did not distinguish among different purposes for which the statements might and might not have been admitted. The law is clear that the government and the trial court, not the defendant-appellant, had the legal responsibility to clarify the basis for admitting testimony, over objection, that otherwise was inadmissible hearsay.

This case resembles *In re M.L.H.,* 399 A.2d 556 (D.C.1979), where "[t]he trial court ruled that the detective's testimony [about what appellant's mother had told him] qualified as one of the [recognized] exceptions [to the hearsay rule] without citing a theory of admissibility in support of its ruling." *Id.* at 558. This court put responsibility for clarifying the grounds for admission of the statement in evidence on the government and the trial court, not on appellant:

This testimony should not have been admitted into evidence unless it fell within one of the recognized exceptions to the hearsay rule, and *on proper objection it is clearly the burden of the party seeking its admission, to identify the appropriate exception and to demonstrate that the testimony fell within it.* And it is the trial court's responsibility to examine the testimony and determine whether the proper foundation has been laid for the exercise of discretion as to its admission.

*Id.* (emphasis added) (footnote omitted).

■ In the instant case, the trial court's ruling admitting Eloise Patton's statements was premised on an erroneous conclusion, over defense objection, that the statements were not hearsay for any purpose. Neither the government nor the trial court suggested that the statements were admissible specifically to show appellant's reaction to them (and indeed could not have invoked that theory for two of the four statements). Therefore, we cannot conclude that defense counsel had the responsibility to recognize admissibility for that limited purpose and to ask for a limiting instruction to that effect—or else suffer the consequences of admission of these statements in evidence.

But even if the trial court had recognized the hearsay problem and had given the jury a limiting instruction, such an instruction would not have solved the problem here. The hearsay testimony concerned four subjects: appellant's employment, his departure from Eloise Patton's apartment, and the two incidents involving Jesus. Taking these four subjects in turn, we conclude that, even with a limiting instruction, the admission of the detectives' testimony about Eloise Patton's hearsay statements very likely would have been an abuse of discretion.

In the first place, Eloise Patton's alleged statements about the two incidents involving Jesus—the alleged murderer at the heart of the defense theory—could not have been used for the nonhearsay purpose that the government now advances. Neither detective testified that appellant reacted in any way to the information that Eloise Patton had denied any knowledge of the two incidents. Indeed, the prosecutor did not even ask either detective whether Ms. Patton's denials, conveyed to appellant by Detective Johnson at the stationhouse, had any effect on appellant. Thus, as to these statements, a limiting instruction would have been irrelevant. Because the testimony about Eloise Patton's statements to Detective Johnson regarding Jesus did not have any non-hearsay purpose, no imaginable limiting instruction could have made the detectives' testimony about the two incidents admissible.

Second, the trial court never properly exercised its discretion on the remaining two subjects, since the court did not recognize a hearsay problem. The only time when Eloise Patton's statements could have been used to show appellant's reaction was when the prosecutor asked Detective Stanton what appellant had said about his mother's denial that he was employed and about her statement that appellant left the house before Brenda Sams did. But as we understand the record, the prejudicial effect of Eloise Patton's statements very well might have outweighed their extremely small probative value as a matter of law, even with a limiting instruction, and thus resulted in an abuse of discretion. *See Campbell v. United States,* 391 A.2d 283, 287 (D.C.1978) ("Despite the trial court's limiting instruction ..., there existed a substantial danger that the jury was unable to confine the [out-of-court] statement to its proper purpose."); *Bennett v. United States,* 375 A.2d 499, 503 (D.C.1977) ("a cautionary instruction may be inadequate where the prejudice resulting from jury misapplication far outweighs the probative value of the [out-of-court] declaration").

The probative value of Detective Stanton's testimony about appellant's reaction when confronted with his mother's statement concerning his employment status was negligible. Appellant staunchly maintained that his mother was mistaken. The government notes that the issue of appellant's employment is a collateral matter. Although true, this observation bears primarily on whether admission of the hearsay was harmless, and thus it cuts against the probative value of appellant's response. On the other hand, a mother's contradiction of her son on such a fundamental fact, even if collateral, added to

the prejudice that the admission of her statements overall caused the defense.

As to appellant's other reaction, according to Detective Stanton, appellant did change his account of the sequence in which he and Brenda Sams had left Eloise Patton's house once he heard what his mother reportedly had said. Although the question about when appellant left Eloise Patton's apartment may have been significant because it involved Brenda Sams, one of the victims, Ms. Patton also testified that appellant had returned to Ms. Patton's door after he left the first time. This unrebutted testimony about appellant's whereabouts after Brenda Sams left Eloise Patton's apartment somewhat reduces the significance of the fact that, during the interview at the police station, appellant changed his account of the sequence of their departures after hearing what his mother had said. That appellant returned not long after Brenda Sams had left, conveying the impression that Sams was gone while appellant was present, arguably reconciles appellant's statements that Brenda Sams—no, appellant himself—had left first. As a result, the unquestioned testimony that appellant returned to Ms. Patton's door substantially reduces the probative value of appellant's reaction. Against this lessened probative value, we note the damaging impeachment purpose of this hearsay testimony: to try to show appellant was a liar about an issue directly relevant to the case.

Despite our doubts about probative value net of prejudice, we do not resolve whether a limiting instruction could have saved admission of the "employment" and "departure sequence" testimony; we shall assume that it could have. The fact is, however, no such instruction was given; the government and the trial court had the responsibility for seeing that it was done; and thus the statements attributable to Ms. Patton remained inadmissible hearsay, received in evidence for their truth. The basic impact of both detectives' testimony was to present appellant's mother as a witness who directly contradicted her own son—obviously devastating impeachment.

## D.

■ We must consider, finally, whether the error in admitting the hearsay was harmless. In this case, the evidence against appellant was entirely circumstantial; there was no eyewitness other than appellant himself. Thus, the believability of his account of the murders—appellant's own credibility— was crucial to his defense. We have already shown that the erroneously admitted hearsay—effectively, a mother's repudiation of several of her son's statements to the police—was highly prejudicial, especially because appellant's testimony on the same matters was otherwise unimpeached. Moreover, evidence admitted at trial on other issues did not so substantially undermine appellant's credibility that his mother's hearsay statements were harmless.

We consider, first, the evidence that would seem potentially most damaging to appellant's credibility: the statements to the police that appellant sought to suppress. The trial testimony of the police officers about appellant's statements to them was generally consistent with his own testimony at trial. The record reveals only four narrow areas where the statements appellant sought to suppress could have possibly impeached his own version of events. (1) One police officer testified that at the scene of the murders appellant said "that several Black male subjects [had] entered [Brenda Sams'] apartment." At trial, however, appellant testified that only one "[l]ight skinned guy," Jesus, was in the apartment. But other police officers, who had interviewed appellant at the stationhouse, testified that he had described Jesus, the only assailant in the apartment, as "between Black and White." This third version provided the jury with a way of reconciling appellant's trial testimony with that of the earlier witness and thus reduced the impact of the impeachment. (2) Two officers testified that appellant had said he hit his head on the television set in the living room, whereas appellant testified at trial that he had hit his head in the bedroom. Another officer, however, testified that appellant had said he hit his head in the bedroom, as appellant himself testified. Once again, therefore, the impeachment was incomplete.

(3) Police officers testified that appellant told them Jesus had stabbed the two women in retaliation against appellant's brother, while at trial appellant ascribed the slayings to his own $12,000 drug debt to Jesus. This inconsistency, in itself, is not conclusively damning. (4) Finally, a police officer testified that, after appellant was arrested, appellant asked "Do you think I can get off with an insanity plea?" Appellant denied that he had inquired about an insanity plea but asserted that the police officer had suggested the defense to him. It is not for us to say that the jury would have believed the police officer over appellant. But even if the jury did not believe appellant's denial, it could have found his question an understandable response to being arrested by someone skeptical about the workings of the criminal justice system.

When these four areas of impeachment are considered together, the inconsistencies between appellant's trial testimony and his alleged statements to the police do not provide such overwhelming evidence of appellant's guilt (when combined with the other circumstantial evidence) that we can say the erroneously admitted hearsay was harmless. The impeachment with appellant's out-of-court statements was either inconclusive or otherwise weak, or in any event was not powerful, especially if the jury found appellant a credible witness. From all that appears of record, therefore, the hearsay testimony from appellant's mother was arguably more damning impeachment, and certainly no less so, than appellant's own reported statements to the police. In fact, Eloise Patton's hearsay testimony surely helped the government undermine appellant's credibility in a way that made appellant's own explanations about his out-of-court statements to the police less believable.

Furthermore, the government's case in other respects was weak. The government never offered a motive for appellant's alleged murder of his girlfriend, Brenda Sams, and her daughter, Kianna. Moreover, appellant's testimony about his drug transactions with Jesus was corroborated by a defense witness, Kenneth Redfear, and appellant's further testimony that Jesus committed the murders of appellant's loved ones in retaliation for a drug debt appellant owed Jesus was not implausible. In addition, appellant's fingerprints were not found on the purported murder weapon, the knife. Nor was any of Brenda Sams' blood found on appellant's clothing even though the victim had been stabbed more than 32 times and blood was all over her bed and bedroom. Only one small stain of Kianna Sams' blood type was found on appellant's clothing despite the fact that she also had been stabbed over 32 times and blood was all over her room. This bloodstain evidence was consistent with appellant's testimony about a struggle with Jesus to prevent the killings. Finally, the trial court, in denying the defense motion for judgment of acquittal, called the case "extremely close."

In light of this record, "[w]e cannot say with fair assurance that the hearsay testimony did not substantially affect the jury's verdict." *Fox v. United States*, 421 A.2d 9, 12 (D.C.1980) (analyzing erroneous admission of hearsay for harmlessness under *Kotteakos*); *see also Campbell, supra*, 391 A.2d at 288 (concluding after *Kotteakos* harmless error analysis that "[w]e cannot say with sufficient certainty that the evidence which properly was admitted was so overwhelming that appellant was not impermissibly and unduly prejudiced by the introduction of ... highly damaging hearsay statement....").[3]

This harmless error analysis is not undermined by the fact that Eloise Patton testified at appellant's trial, four days before either of the detectives who introduced her statements in evidence testified. In *Carr v. United States*, 585 A.2d 158, 162 (D.C.1991), this

---

**3.** In *Carter, supra*, 614 A.2d at 545, we held that erroneous admission of a police officer's hearsay testimony about the content of a phone call was harmless under *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). In that case, however, appellant's testimony was impeached not only by the hearsay but also by properly admitted evidence. We concluded that such cumulative impeachment, considered in conjunction with other evidence of appellant's guilt, saved the conviction. The present case is different from *Carter* in that the impeachment of appellant with his own out-of-court statements was not strong enough to make the hearsay impeachment cumulative or innocuous.

court held that the trial court erred in admitting hearsay evidence when one witness testified about what a later witness who also testified had said at the time of the incident. We stated, more specifically, that because the later witness's testimony was not impeached, the earlier admitted hearsay was "a prior consistent statement ..., not admissible under any of the exceptions to the normally required exclusion of such statements." *Id.* Nonetheless, while noting "that 'mere repetition does not imply veracity,'" *id.* at n. 3 (quoting *Sherrod v. United States,* 478 A.2d 644, 660 (D.C.1984)), we concluded that the error in admitting the hearsay was harmless under the circumstances. *See id.* at 162 (citing *Sherrod* (finding no plain error in admitting hearsay testimony that "substantially comported" with trial testimony of original declarant)).

If, as the trial court did, we were to focus exclusively on the first level of hearsay—Detective Stanton's testimony about what Detective Johnson said—*Carr* would justify a ruling that the error in admitting that testimony was harmless because Detective Johnson's later testimony clearly confirmed Detective Stanton's account. As in *Carr,* "appellant had ample opportunity on cross-examination of [Detective Johnson] to explore any inaccuracies in the prior statement as testified to by [Detective Stanton]." *Id.*

Eloise Patton's hearsay testimony, however, conveyed through both detectives, is unaffected by *Carr.* Neither detective's testimony about her statements corroborated her own testimony. Eloise Patton did not testify about her son's employment. She did not mention Jesus or discuss any incidents that might have involved him. Even her testimo-

ny about when appellant and Brenda Sams, respectively, left her house was not entirely consistent with the detectives' versions of what she had said on the phone; although Eloise Patton reportedly told Detective Johnson that appellant had left before Brenda Sams, and at trial she also testified that appellant left first, she added at trial that appellant had returned after Brenda Sams left. As a result of these omissions and discrepancies, when Eloise Patton's trial testimony is compared with the detectives' trial testimony about what she had said to Detective Johnson on the telephone, we cannot conclude that the hearsay was merely cumulative and that the trial court's error in admitting it was harmless.

■ Furthermore, in *Carr* the hearsay statements were admitted before the original declarant testified. This sequence contributed to the appellant's "ample opportunity" in that case to cross-examine the declarant. Here, however, Eloise Patton testified four days before the hearsay statements were admitted. In order for appellant to have cross-examined her on the hearsay statements proffered by Detectives Stanton and Johnson, appellant would have had to recall Eloise Patton to the stand. But appellant was not obliged to rehabilitate the government's case in that way. The government had every opportunity to ask Eloise Patton directly about her conversation with Detective Johnson. Curiously, the government chose not to do so, preferring to take its chances instead with hearsay testimony from the police detectives. The government, therefore, must rest its argument on the propriety of that tactical decision.[4]

4. Appellant contends that the trial court's error in admitting Eloise Patton's hearsay statements violated his Sixth Amendment confrontation rights. If true, this would require us to invoke the harmless error test ("beyond a reasonable doubt") under *Chapman v. California,* 386 U.S. 18, 22–24, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967). By our disposition here we need not reach the constitutional question, but for completeness we believe it appropriate to note why appellant's position is incorrect. *Carr* stands for the proposition that, because appellant could have recalled Eloise Patton, no Confrontation Clause violation occurred. This court stated: "No infringement of a defendant's rights under that constitutional provision occurs 'by admitting

a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination.'" *Carr, supra,* 585 A.2d at 161 (quoting *California v. Green,* 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970)). We concluded that the cross-examination of the declarant on the matter at issue need not actually take place: "Only an 'opportunity' for effective cross-examination is required; 'successful cross-examination is not the constitutional guarantee.'" *Id.* (quoting *United States v. Owens,* 484 U.S. 554, 559, 108 S.Ct. 838, 842, 98 L.Ed.2d 951 (1988)). Because appellant had the opportunity to cross-examine

### III.

Appellant's next contention is that the trial court erred in refusing to suppress all statements that he made to the police during the period of time beginning with his "detention" by Officer Braxton at the time of the original encounter on the street, up to and including the final statement that he made after his arrest. He also contends that the trial court should have suppressed the physical evidence obtained from him during that period. The trial court found that the appellant was never in custody until his formal arrest based on probable cause, and that all his prior statements were made at a time when his presence was entirely voluntary. The court concluded that there was no violation of appellant's Fourth or Fifth Amendment rights, and thus denied the motion as to both the statements and the physical evidence.

■ In reviewing the determination that appellant was neither in custody nor seized, we defer to the trial court's findings of fact, but determine the question of law *de novo.* See In re E.A.H., 612 A.2d 836, 838 (D.C. 1992) (dealing with custody); *United States v. Gayden,* 492 A.2d 868, 872 (D.C.1985) (dealing with seizure). "The inquiry is an objective one, and the court must consider the totality of the circumstances." *E.A.H., supra,* 612 A.2d at 838.

Appellant argues that he was seized within the meaning of the Fourth Amendment and in custody within the meaning of the Fifth Amendment from the time that Officer Braxton was first told to stay with him after he had brought the police to the apartment. He contends that the statement made to Detective Adams during that initial period[5] must be suppressed because it was made following an illegal seizure, violating his Fourth Amendment rights, and in the absence of *Miranda*[6] warnings, violating his Fifth Amendment rights.

■ A seizure occurs when " 'the police have by word or conduct manifested to the suspect that he is not free to leave,' " *Johnson v. United States,* 616 A.2d 1216, 1226 (D.C.1992) (quoting *Calaway v. United States,* 408 A.2d 1220, 1224 (D.C.1979)), *cert. denied,* —— U.S. ——, 113 S.Ct. 1611, 123 L.Ed.2d 172 (1993), and "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave," *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980); *Kelly v. United States,* 580 A.2d 1282, 1285 (D.C. 1990). The court "must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick,* —— U.S. ——, ——, 111 S.Ct. 2382, 2389, 115 L.Ed.2d 389 (1991). "The test looks to 'not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person.' " *United States v. Jordan,* 294 U.S.App.D.C. 227, 228, 958 F.2d 1085, 1086 (1992) (quoting *California v. Hodari D.,* 499 U.S. 621, ——, 111 S.Ct. 1547, 1551, 113 L.Ed.2d 690 (1991)).

### A.

■ We may postulate, for the moment, that the detention of appellant by Officer Braxton was a seizure. We think it plain that under our case law, the detention of appellant for a reasonable period of time was justified under the doctrine of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See, e.g., In re M.E.B.,* No. 90–FS–1602 (D.C. Feb. 23, 1993) 1993 WL 47316. Appellant, covered with blood, came to the police with a report that a person had been murdered in his apartment. He voluntarily sought out the police and requested their intervention and assistance. His detention for a period of time would be warranted

---

Eloise Patton, no Confrontation Clause violation occurred.

5. The challenged statement was that "several Black male subjects entered the apartment, ... [a]nd he had attempted to fight them off...."

6. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

while the police could enter the apartment and conduct an initial investigation. *See Reid v. United States*, 581 A.2d 359, 364 n. 7 (D.C.1990); *United States v. Calhoun*, 363 A.2d 277, 283–84 (D.C.1976). Indeed, in addition to his status as a possible suspect, it was clear from appellant's own statements that he was a crucial witness to the events. *See Michigan v. Summers*, 452 U.S. 692, 700 n. 12, 101 S.Ct. 2587, 2593 n. 12, 69 L.Ed.2d 340 (1981); *Williamson v. United States*, 607 A.2d 471, 476 (D.C.1992) (Farrell, J., concurring), *cert. denied*, —— U.S. ——, 114 S.Ct. 96, 126 L.Ed.2d 63 (1993). The challenged statement was made shortly after the postulated *Terry* seizure and plainly within the reasonable time limit for such a detention, so the admission of this statement did not violate the Fourth Amendment rights of appellant, even assuming that appellant had been seized at the time.

 We do not need to rely on the foregoing analysis, however. The trial court ruled, in effect, that no seizure occurred at any point prior to the formal arrest. The trial court specifically found that appellant was not in custody until the moment of formal arrest. The trial court defined "custody" as the situation "when a state agent physically deprives the suspect of his freedom of action in any significant way or under the circumstances leads him to believe, as a reasonable person, that he is so deprived." While the trial court called this "custody," the definition that he gave actually describes a Fourth Amendment "seizure." [7] Using that standard, the trial court found that appellant was not "in custody" until the time of formal arrest. Since he was actually defining a seizure, the trial judge, in effect, found that appellant was not seized until formally placed under arrest. We think that the record fairly supports this conclusion.

 On the facts here, throughout the duration of Patton's initial contact with the police, his remaining with them during the investigation, and their accompanying him to the hospital, the police, although perhaps suspicious, were not depriving him of his freedom of movement. Appellant had voluntarily come to the police and asked them to investigate. The fact that appellant initiated the encounter with the police "shed[s] light on the tone of ensuing events and ... has an important bearing" on whether a reasonable person would have felt free to leave. *Giles v. United States*, 400 A.2d 1051, 1054 (D.C. 1979). The only testimony of the officers which might be used to conclude that appellant was seized are the statements of the officers that they would not have let appellant leave if in fact he had desired to do so, a fact which is not conclusive on the issue of seizure, and the testimony that Officer Flemens told Braxton not to let appellant leave, a statement which only speculation would ascribe to appellant's having heard. Moreover, appellant was obviously wounded and weak and the police remaining with him and making sure that he was transported to the hospital could reasonably be construed as acts of cooperation and concern. There is no evidence indicating the contrary. Moreover, the continued police interest in his condition and whereabouts, given his role as a witness, are not inconsistent with his right to leave. There was no testimony that he requested to leave, and although not itself dispositive, his failure to do so is relevant. *United States v. Allen*, 436 A.2d 1303, 1309 (D.C.1981); *see Guadalupe v. United States*, 585 A.2d 1348, 1353–54 (D.C.1991). We conclude that appellant was not seized and further, that even if he was seized, the detention did not exceed the bounds of a permissible *Terry* stop.

 Appellant's argument that he was in custody during this initial period of time, and therefore that he had a Fourth Amendment right to be given the *Miranda* warnings, is even less well founded. "Custody" is

---

7. Some of our cases have in fact contained language tending to equate a Fourth Amendment "seizure" with Fifth Amendment "custody." The Supreme Court, however, has made clear that the two concepts are not synonymous. The correct test for determining whether a person is in custody for Fifth Amendment purposes is whether the person is subject to the degree of restraint on freedom of movement to the degree associated with a formal arrest. *See Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984) (quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam)); *E.A.H., supra*, 612 A.2d at 838; *McIlwain v. United States*, 568 A.2d 470, 472 (D.C.1989).

present only when the individual's freedom of movement is curtailed to the "degree associated with a formal arrest." *See Berkemer, supra* note 7, 468 U.S. at 439–40, 104 S.Ct. at 3149–50 (quoting *Beheler, supra* note 7, 463 U.S. at 1125, 103 S.Ct. at 3520); *E.A.H., supra,* 612 A.2d at 838; *McIlwain, supra* note 7, 568 A.2d at 472. The initial level of detention, even if sufficient to constitute a seizure, did not constitute custody, and the admission of statements given during that time, therefore, did not violate *Miranda. See E.A.H., supra,* 612 A.2d at 838 ("a restraint on liberty which would constitute a seizure under the doctrine of *Terry* . . . does not necessarily place the seized person in custody for *Miranda* purposes"); *McIlwain, supra* note 7, 568 A.2d at 473.

### B.

Appellant next asserts that regardless of what happened earlier, the government failed to satisfy its burden of demonstrating that appellant came to the homicide office voluntarily and was neither placed in custody nor seized during the unexplained time interval between the time appellant was at the hospital and the time he arrived at the homicide office.[8] He urges this court to recognize that in the absence of any evidence as to the events that occurred during this time, the court must find that the government failed to satisfy its burden and therefore, that appellant did not travel to the office voluntarily. It is undisputed that there was no probable cause to arrest appellant at the time he was transported to the homicide office, so if, indeed, he was seized at this point, such a seizure, exceeding the bounds of a permissible *Terry* stop, would be illegal, violating the Fourth Amendment. *Allen, supra,* 436 A.2d at 1309.

For two reasons we are not persuaded that appellant was illegally seized. First, even assuming that the government has the burden of proof on the point, the government did sufficiently prove that the interaction between appellant and the police from the initial contact to the hospital was voluntary and likewise that the appellant's remaining at the police station after his arrival there was also voluntary. *See Kelly, supra,* 580 A.2d at 1285; *Bridges v. United States,* 392 A.2d 1053, 1056 (D.C.1978), *cert. denied,* 440 U.S. 938, 99 S.Ct. 1286, 59 L.Ed.2d 498 (1979); *see also Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam). Such being the case, there is no reason to think other than that the appellant's accompanying the police to the police station was also the result of his voluntary desire to cooperate with the police in the presentation of his full account of the events.

Second, even if it is assumed that the trip from the hospital to the police station was involuntary or indeed, the initial contact viewed as a *Terry* seizure was continued for an impermissible amount of time by the transportation to the hospital, we think that the events that occurred at the police station effectively dissipated any taint of unlawful seizure prior to that point.

Evidence discovered as the result of an illegal seizure generally must be suppressed as "fruit of the poisonous tree." This rule applies to both physical evidence and testimonial evidence. *Wong Sun v. United States,* 371 U.S. 471, 484–86, 83 S.Ct. 407, 415–17, 9 L.Ed.2d 441 (1963); *United States v. Mergist,* 738 F.2d 645, 647 (5th Cir.1984). If, however, "an intervening event or other attenuating circumstance purges the taint of the initial illegality," the evidence need not be suppressed. *United States v. Wood,* 299 U.S.App.D.C. 47, 52, 981 F.2d 536, 541 (1992) (quoting *United States v. Jordan,* 294 U.S.App.D.C. 227, 231, 958 F.2d 1085, 1089 (1992)). Once an illegal seizure is established, the government bears the burden of proving "that the causal chain was sufficiently attenuated by an independent act to

---

8. Appellant was brought from the hospital to the homicide office by a uniformed police officer. That officer was on active military duty in the Persian Gulf for Operation Desert Storm at the time of the hearing. The record is bare of any explanation of the details of the circumstances involved in such transportation of appellant.

For reasons discussed *infra,* we need not resolve the questions, much debated in the briefs, as to whose responsibility it was to proffer evidence on this point and as to the presumptions which are operable in the absence of any proof of the circumstances.

dissipate the taint of the illegality." *Id.;* *Brown v. Illinois,* 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975).[9] The statements made and evidence recovered subsequent to the postulated seizure must have been "sufficiently an act of free will to purge the primary taint." *Wong Sun, supra,* 371 U.S. at 486, 83 S.Ct. at 416–17; *see* *Brown, supra,* 422 U.S. at 603, 95 S.Ct. at 2261. There must be a break in "the causal connection between the illegality and the confession." *Gayden, supra,* 492 A.2d at 875 (quoting *Brown, supra,* 422 U.S. at 603, 95 S.Ct. at 2261).

The Supreme Court has enumerated a number of factors relevant to the determination of whether statements made after a seizure violative of the Fourth Amendment were sufficiently attenuated such that the taint of illegality was dissipated.

> The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant.

*Brown,* 422 U.S. at 603–04, 95 S.Ct. at 2261–62 (internal footnotes and citations omitted); *see Taylor v. Alabama,* 457 U.S. 687, 690, 102 S.Ct. 2664, 2666, 73 L.Ed.2d 314 (1982); *Dunaway v. New York,* 442 U.S. 200, 218, 99 S.Ct. 2248, 2259, 60 L.Ed.2d 824 (1979). While a reading of the *Miranda* rights alone is not sufficient to dissipate an illegal seizure,[10] *Dunaway, supra,* 442 U.S. at 217, 99 S.Ct. at 2259; *Brown, supra,* 422 U.S. 590 at 604, 95 S.Ct. 2254 at 2262; *Gayden, supra,* 492 A.2d at 875, there was far more than that here. The subsequent conduct and events

made it clear that appellant was entirely free to leave and any further stay or conversation was purely appellant's voluntary decision and that this was plainly conveyed to appellant. We hold that the actions of the detectives at the homicide office, and especially the repeated reminder that appellant was not under arrest and that he was free to leave, *cf. Dunaway, supra,* 442 U.S. at 212, 99 S.Ct. at 2256 (Court found significant that suspect was never told that he was free to leave); *Allen, supra,* 436 A.2d at 1309 (same), constitute sufficient attenuation such that any possible taint of an earlier seizure (which we only postulate) was dissipated. *See Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980).

When appellant was brought to the homicide office, he was not handcuffed. He was asked if he wanted anything to make him more comfortable, such as cigarettes, the use of the men's room, or anything to drink or eat. He was then brought to the interview room by Detective Stanton, and asked to have a seat. Detective Stanton read the *Miranda* warnings to appellant, except that appellant was advised that he was *not* under arrest. Appellant was at the homicide office only fifteen to thirty minutes before the warnings were read to him. When appellant signed the PD–47 "rights" card, the detectives "showed [appellant] that at any time that he wanted to stop, he could stop, and he was free to get up and leave." The detectives were not carrying guns. They asked appellant if he would tell them what happened, and he responded, "sure, no problem." They proceeded to question him. Most tellingly, the conclusion that appellant's presence at the homicide office at this point was utterly voluntary is strengthened by appellant's own words at trial, squarely stating that he was repeatedly told by the police: "If

<hr/>

9. We here postulate that the reasonableness of the original *Terry* stop had been exceeded by the continuance of the seizure to the hospital and subsequently to the homicide office.

10. "If *Miranda* warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially dilut-

ed." *Brown, supra,* 422 U.S. at 602, 95 S.Ct. at 2261. "Law enforcement officers [would be allowed] to violate the Fourth Amendment with impunity, safe in the knowledge that they could wash their hands in the 'procedural safeguards' of the Fifth [Amendment]." *Allen, supra,* 436 A.2d at 1310 (quoting *Dunaway, supra,* 442 U.S. at 218–19, 99 S.Ct. at 2259–60).

you want to leave, you can leave anytime you want." [11]

The strength of the acts required to dissipate an illegal seizure can fairly be seen as a function of the severity of the initial unauthorized seizure. Hence where, as here, the initial seizure must be deemed permissible under a *Terry* analysis, so that its unauthorized nature flows only from the extended duration or from an assumption arising from a lack of proof demonstrating voluntariness, we think it sufficient that it was made clear to appellant in the strongest possible terms that his continued presence at the homicide office and conversation with the police was totally voluntary. This was sufficient to attenuate the taint of illegality stemming from any initial seizure and to render the subsequent statements admissible. [12] Nothing that occurred during the extended period of dialogue with the police demonstrates a change in the voluntary nature of appellant's remaining at the police station until his arrest, as found by the trial court.

### C.

Appellant argues that even if he originally spoke with the detectives at the homicide office on a voluntary basis, there came a point at which the questioning could no longer continue. Appellant focuses on one particular event, namely, his request that he be allowed to make a telephone call to his father "because his father had an attorney he would refer to him." Appellant argues that under the doctrine of *Ruffin v. United States*, 524 A.2d 685 (D.C.1987), *cert. denied*, 486 U.S. 1057, 108 S.Ct. 2827, 100 L.Ed.2d 927 (1988), this amounted to at least an "ambiguous" invocation of the right to counsel, and therefore the police could not continue to interrogate him without a "clarification" of whether or not he was invoking his right to counsel. He further asserts that the detectives failed to adequately clarify his wishes, and all statements made after this point, therefore, were a violation of his rights under *Miranda*.

The basic fallacy of this argument is that it postulates that appellant was in "custodial interrogation" when he made the statement. In fact, as indicated above, he was not. Therefore, the statement was not a *Ruffin* invocation of the right to counsel, which accrues under *Miranda* only within the context of custodial interrogation. [13] The

11. Although this testimony of appellant was not before the trial judge at the time the ruling on the pretrial suppression motion was made (appellant did not testify at the suppression hearing), we may properly consider such testimony on appeal in support of the trial court's ruling. *See Martin v. United States*, 567 A.2d 896, 902 n. 16 (D.C.1989) (Court of Appeals can consider all testimony from the suppression hearing and undisputed testimony from the trial), *appeal after remand*, 605 A.2d 934 (D.C.1992), *cert. denied*, — U.S. ——, 113 S.Ct. 632, 121 L.Ed.2d 563 (1992).

12. Since we find that appellant was not seized during the time he spent at the homicide office (and *a fortiori* not in custody, since custody is a more intrusive measure) the appropriate inquiry is whether his statements were made voluntarily.

The government bears the burden of proving that the statements made by appellant were voluntary. *See Lego v. Twomey*, 404 U.S. 477, 484, 489, 92 S.Ct. 619, 624, 626, 30 L.Ed.2d 618 (1972); *Rogers v. United States*, 483 A.2d 277, 286 (D.C.1984), *cert. denied*, 469 U.S. 1227, 105 S.Ct. 1223, 84 L.Ed.2d 363 (1985); *Hawkins v. United States*, 304 A.2d 279, 282 (D.C.1973). Statements are voluntary if they are "the product of an essentially free and unconstrained choice by its maker." *Culombe v. Connecticut*, 367 U.S.

568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961) (plurality opinion) (approved in *Schneckloth v. Bustamonte*, 412 U.S. 218, 225–26, 93 S.Ct. 2041, 2046–47, 36 L.Ed.2d 854 (1973)). The ultimate issue of whether the statements were voluntary is a legal question, *Mincey v. Arizona*, 437 U.S. 385, 398, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290 (1978); *Ruffin v. United States*, 524 A.2d 685, 691 (D.C.1987), *cert. denied*, 486 U.S. 1057, 108 S.Ct. 2827, 100 L.Ed.2d 927 (1988), but considerable deference must be given to the factual findings of the trial court in this area, *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); *see also Byrd v. United States*, 618 A.2d 596, 599 (D.C. 1992); *Hawthorne v. United States*, 504 A.2d 580, 586 (D.C.), *cert. denied sub nom. Myrick v. United States*, 479 U.S. 992, 107 S.Ct. 593, 93 L.Ed.2d 594 (1986).

Applying these standards, we find that the statements made by appellant were all made voluntarily.

13. We need not decide, therefore, whether or not the questions asked by Detectives Stanton and Johnson after appellant's telephone call to his father would have been sufficient clarification of his desire to remain silent except in the presence of counsel had appellant's rights under *Miranda* and *Ruffin* accrued.

*Ruffin* clarification requirement only arises when *Miranda* is applicable, which is only in the event of custodial interrogation. The difficulty with appellant's argument that the requirement applies in this case is that in the context of *voluntary* dialogue, it makes no sense. By definition, if a person who is not in custody no longer wishes to speak to the police for whatever reason (including not wishing to speak in the absence of counsel), the person may simply walk away. The need for the *Ruffin* clarification is that the option to walk away is not available to the individual who is held in custody.

At most, appellant's request could have been an indication that appellant no longer wished to speak with the police, but this is belied by the record. In response to appellant's request, Detective Stanton dialed the number given to him by appellant and then handed the receiver to appellant. Detective Stanton moved away from appellant and sat at a desk which was eight or nine feet away and Detective Johnson "was in the general vicinity." The conversation lasted approximately six to eight minutes, and appellant ended the telephone call on his own accord. When Detective Stanton saw appellant hang up the telephone, he went over to where appellant was standing and asked appellant whether he still wanted to talk to the detectives or whether he wanted to stop talking. Detective Stanton then asked appellant several questions to ensure that appellant still wanted to talk of his own free will, that he was aware that he was not under arrest, and that he was aware that the rights which had been read to him earlier still existed. Appellant indicated that he understood. Detective Stanton told appellant that he was not under arrest and that he was free to go if he

wanted to, and that he did not have to talk to the officers if he did not want to. Appellant responded that he did not want to stop, that he knew his father was not going to do anything to help him, and that he did not care about his father anyway. Detective Stanton testified that in order to be ensure that appellant wanted to talk on his own free will, he reiterated the fact that appellant need not talk to the detectives. He asked appellant whether appellant realized that he was not under arrest, stating that it was just an "open interview," and that appellant was free to go. Appellant responded "yeah." Detective Johnson testified that they "asked him ... would he like to continue talking," and appellant said yes. Appellant then returned to the interview room with the two detectives, and the questioning continued. The questions asked and actions taken by Detectives Stanton and Johnson after appellant's telephone call were clearly sufficient inquiry into the voluntariness of further questioning.[14]

■ Since all statements made by appellant prior to the formal arrest were admissible, and since it was these statements that led to the final determination of probable cause, it follows that the statement made after arrest is likewise not suppressible.[15] Accordingly, we reject the argument of appellant that on retrial, the challenged statements and the physical evidence must be suppressed as unconstitutionally obtained.

**IV.**

■ Appellant's final argument is that the trial court erred in its denial of appellant's motion for judgment of acquittal on the

14. Appellant also asserts that no questioning should have taken place after he "asked to leave" the homicide office prior to going outside to meet his father. Detective Hearron testified that when appellant asked to leave, Detective Hearron in turn asked appellant, but did not require him, to stay long enough to speak with Detective Young, who was the lead detective in the case and would be arriving at the office shortly and would want to speak with appellant. Detective Hearron further testified that after this request appellant agreed to stay because he wanted to find out what was happening from Detective Young. Appellant also asserts that Detective Hearron insist-

ed on accompanying appellant outside to meet his father, while Detective Hearron testified that he went outside with appellant purely at appellant's request. In his findings on the motion to suppress, the trial court credited the testimony of the officers, specifically finding that the officers were telling the truth.

15. The challenged statement made after appellant's formal arrest was the question to Detective Young, "Do you think I can get off with an insanity plea?"

## 820

first degree murder while armed counts.[16] Appellant contends that the government failed to present sufficient evidence of premeditation or deliberation in either of the two deaths. In reviewing a denial of a motion for judgment of acquittal, this court must view the evidence in the light most favorable to the government, *Curry v. United States*, 520 A.2d 255, 263 (D.C.1987), giving deference to the fact finder's right to weigh the evidence, determine the credibility of the witnesses, and draw inferences from the evidence presented, *In re L.A.V.*, 578 A.2d 708, 710 (D.C.1990). We can only reverse a conviction on this ground if there is "no evidence upon which a reasonable mind could infer guilt beyond a reasonable doubt." *Head v. United States*, 451 A.2d 615, 622 (D.C.1982).

■■■■ To convict on a charge of first degree murder while armed, the government must establish that the defendant intentionally killed another human being with premeditation and deliberation, *see* D.C.Code § 22–2401(a) (1989). To prove premeditation, the government must demonstrate that the defendant, before acting, thought about the idea of taking a human life and reached a decision to kill. *McAdoo v. United States*, 515 A.2d 412, 427 (D.C.1986). To prove deliberation, the government must demonstrate that the defendant acted with consideration and reflection upon the preconceived decision to kill. *Id.* "Premeditation and deliberation may be inferred from surrounding facts and circumstances." *Id.*

■■■■ All the evidence presented at trial, taken together, supports that trial court's denial of the motion for judgment of acquittal. Brenda and Kianna Sams were each stabbed repeatedly over their entire bodies and suffered numerous blunt force injuries on their heads and faces. While multiple stab wounds do not alone support an inference of premeditation and deliberation, they can properly be joined with other factors to support such an inference. *See Austin v. United States*, 127 U.S.App.D.C. 180, 190 n. 22, 382 F.2d 129, 139 n. 22 (1967). Other factors supporting the inference include the

use of a kitchen knife in the murders (allowing the jury to infer that appellant carried the knife from the kitchen to the bedroom with the intention of using it to kill Brenda and Kianna) and the fact that there were two victims, killed in separate rooms at separate times. *See Mills v. United States*, 599 A.2d 775, 782 (D.C.1991). Examining all the evidence in the light most favorable to the government, we cannot say that no reasonable jury could infer that the murders were committed with premeditation and deliberation and that the defendant was guilty of first-degree murder beyond a reasonable doubt.

*Reversed and remanded.*

---

**16.** Despite the remand, we must address this issue because of double jeopardy considerations.

*See Lockhart v. Nelson*, 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988).