**In re TY.B. and In re Ti.B.;**
**T.B., Appellant.**

Nos. 01–FS–1307, 01–FS–1320.

District of Columbia Court of Appeals.

Argued April 12, 2005.

Decided July 21, 2005.

Brenda C. Wagner, Washington, DC, for appellant.

Stacy L. Anderson, Assistant Attorney General for the District of Columbia, with whom Robert J. Spagnoletti, Attorney General, and Edward E. Schwab, Deputy Attorney General, were on the brief, for appellees.

Before SCHWELB, REID, and GLICKMAN, Associate Judges.

SCHWELB, Associate Judge:

On June 28, 2001, following an evidentiary hearing, the trial judge found that respondents Ty.B. (a boy) and Ti.B. (a girl), twins, who were born on October 13, 1993, were neglected children within the meaning of D.C.Code § 16–2301(9)(B) (2001), because they were without parental care or control necessary for their mental health. The finding of neglect was premised on an alleged history of domestic violence said to have been inflicted by the children's father, T.B., on their mother, Y.B., who had been the father's paramour (according to the District) or common law wife (according to counsel for the father) until her disappearance on August 1, 1999. At the time of the evidentiary hearing, the mother's whereabouts were unknown, and she is presumed by the parties to be deceased. On September 17, 2001, the judge

ordered that the respondents remain in the custody of J.D.H.-P., one of their maternal aunts, with whom they had been residing since the mother's disappearance.

The father has appealed, contending primarily that the trial judge's findings were largely based on hearsay statements which the judge erroneously received in evidence, over objection, as admissions of a party opponent. We conclude that much of this testimony was inadmissible, that the father adequately preserved his objection to its admission, and that the error was not harmless. Accordingly, we reverse the adjudication of neglect and the award of custody and remand the case to the trial court for further proceedings consistent with this opinion.

## I.

## THE TRIAL COURT PROCEEDINGS

### A. Background.

At the evidentiary hearing, the District's evidence consisted primarily of the testimony of four maternal aunts of the twins: J.D.H.-P., N.H., S.G., and A.F., and the expert testimony of a clinical psychologist, "Dr. X." [1] These witnesses testified, and it is undisputed, that prior to their mother's disappearance, the twins had been living with both of their parents, who by all accounts, had a stormy relationship with one another. The District's theory of the case was that the father had physically abused the mother, that he was the prime suspect in the mother's disappearance and possible death,[2] and that the twins should

1. For reasons not readily discernible from the record, but perhaps related to the mother's disappearance, the witness asked to remain anonymous. We were advised at oral argument, however, that the father's attorney was aware of Dr. X.'s identity.

2. While the neglect case was proceeding, the father was the target of a grand jury investi-

gation relating to the mother's disappearance. On the recommendation of his attorney in the neglect case, the father consulted the Public Defender Service (PDS) with regard to any possible criminal charges. The trial judge in the neglect case excluded the father's PDS attorney, Jonathan Rapping, from the courtroom and prohibited all participants in that

not be placed with their father because, according to Dr. X, they were suffering from Post Traumatic Stress Disorder (PTSD) as a result of their exposure to family violence in the home. The District adduced no evidence, however, that the father physically abused the children, and the claim of neglect was not based on any such allegation.

The District's witnesses testified that after a family function that began on the evening of July 31, 1999, and continued into the early hours of the following morning, the family lost contact with the mother. On August 4, 1999, S.G., one of the children's maternal aunts, received a telephone call during which she was asked to meet her family at the police station. When she arrived, the father and the twins were already there. The police asked S.G. to take care of the children while the father was being interrogated. The twins were then brought to the home of another maternal aunt, J.D.H.-P.

On March 16, 2000, the District instituted neglect proceedings. On the same date, the court ordered that the respondents remain in the custody of J.D.H.-P. The twins have apparently resided with J.D.H.-P. since that time.

### B. *The hearsay testimony.*

At the evidentiary hearing, the four maternal aunts testified regarding statements made to each of them by the mother concerning violence allegedly inflicted upon her by the father. Although the aunts personally observed some evidence of physical abuse between the mother and the father, see Part I.C, *infra,*—the aunts did not themselves witness the alleged acts of violence by the father. On the contrary, the aunts' testimony consisted primarily (though not exclusively) of assertions that the mother had made to each aunt about the mother's relationship with the father. The trial judge admitted this evidence over the father's hearsay objection. In a written order *in limine*, the judge ruled "that the relevant witness may testify to statements made to her by respondents' mother." In the judge's view, further explicated in Part II.A, *infra*, the mother (though missing and possibly dead) was a party to the neglect proceedings, and her out-of-court statements were therefore admissible against the father "as an admission of [a] party opponent."[3] This decision, and the oral rulings that preceded it, set the rules of engagement for the entire proceeding.

As a result of the judge's ruling that statements by the mother to her sisters

proceeding from sharing with Mr. Rapping any information obtained during the hearing. The father filed an interlocutory appeal, and this court reversed, concluding that the trial judge had abused her discretion by barring Mr. Rapping from the courtroom and by prohibiting the father and his neglect counsel from conferring with Mr. Rapping regarding the neglect proceeding. *In re Ti.B.,* 762 A.2d 20, 33 (D.C.2000).

At the evidentiary hearing in the neglect case, the father's attorney stated that his client would invoke his privilege against self-incrimination, because he was under investigation in connection with the disappearance of the mother. *Id.* at 23–24. The judge ruled that the father would not be permitted to assert a blanket privilege, and instead would have to invoke the privilege on a question-by-question basis. Ultimately, the father invoked the privilege as to most questions, and he gave little or no substantive testimony regarding the issues before the court in the neglect case.

Counsel for the District did not ask the trial court to draw an adverse inference against the father for invoking the privilege in a civil proceeding. This issue not having been raised, we do not address it.

3. The judge likewise held that the twins were parties, and that their out-of-court statements were also admissible on the same basis.

were "admissions of a party opponent," the proceedings consisted largely of the reception of testimony which, for reasons explained below, should have been excluded as inadmissible hearsay evidence. For example, J.D.H.-P., the District's first witness, testified that the mother reported to her, *inter alia,*

1. that during the summer of 1993, while (the mother) was pregnant with the twins, the father struck her with his fist in the stomach, causing her to be hospitalized;[4]

2. that in an incident that occurred around 3:00 a.m. one morning in 1995, the mother reported to the witness that the father was abusive to her;[5] the mother subsequently told J.D.H.-P. that the bruises on her body were inflicted by the father;[6]

3. that in June 1996, the father came to the mother's place of work and screamed profanities at her, allegedly in front of the children;

4. that in the spring of 1998, the father pulled hair (braids) out of the mother's scalp;[7]

5. that in the summer of 1999, during a family outing, the father pushed the mother in front of the children;

6. that in 1999, the father was not fulfilling his child support obligations;

7. that the father would come home intoxicated after smoking "that stuff," and

8. that the father did not make the children wear seat belts, and that as a result, Ti.B. lost a tooth in a car accident while the father was driving.

J.D.H.-P. also testified that after the 1993 incident, she had numerous conversations with the mother in which the mother described abusive actions allegedly directed at her by the father.[8]

### C. Non-hearsay testimony.

The respondents' aunts also provided some testimony based on their own observations; we note some examples below. As we have previously indicated, J.D.H.-P. saw bruises on the mother following reported fights with the father; S.G. and A.F. testified to the same effect. N.H. testified that in the summer of 1999, the mother ran into N.H.'s home with the twins, with the father in pursuit. The father yelled that "[i]f she keeps messing with me, I'm gonna hurt her." The father, who had apparently been ordered by the court to leave the house in which he had been living with the mother and the twins, also demanded that the mother withdraw requests that she had made for a civil protection order and for child support so that he could return to the home, adding that "[i]f I can't live in it, can't nobody live

---

4. The witness later visited the mother in the hospital.

5. The witness later came to the mother's house and observed that the mother had suffered bruises to her body and an injury to her ankle. Some of the furnishings were also broken.

6. According to a second maternal aunt, N.H., the mother told her that her ankle was broken in a fight with the father.

7. J.D.H.-P. testified that she had seen the resulting bald spot on the mother's head.

8. The basic thrust of J.D.H.-P.'s testimony was corroborated by each of the respondents' three other maternal aunts who gave evidence at the hearing. Each of these witnesses testified that the mother had reported to her that she had been physically abused by the father. According to N.H., Ti.B. told her that "[M]ommy and [D]addy were fighting," and that she (Ti.B.) was scared. N.H. also testified that the mother had reported to her that in one of his rages, the father had made holes in the walls and had torn up furniture.

in it." N.H. also testified that she had seen damaged clothing belonging to the mother which, according to the mother, had been cut up by the father. S.G. told the court that in 1997, the father screamed profanities at the mother and at the mother's mother, and that he then threw a metal "club" at the mother's car, shattering the windshield. A.F. testified that she saw the father grab and violently pull the mother, in front of the children, during a family outing in 1999. N.H. and J.D.H.-P. both reported that the father drank malt liquor in front of the children.[9] No witness testified, however, that the father ever abused or mistreated either of the twins, other than to the extent that his alleged physical abuse of the mother may have constituted psychological abuse of the children.

D. *The expert testimony.*

Dr. X. testified in some detail regarding the effects upon children of domestic violence inflicted by one parent on the other. Dr. X. was of the opinion that when a child witnesses the physical abuse of a parent, this can be as detrimental to the child as being personally victimized by such violence. After examining the two respondents for a total of 3½ hours, Dr. X. concluded that, although both children were friendly and intelligent, each of them was suffering from PTSD. According to Dr. X., there was a prevailing belief in the psychological community that children should not be placed in the sole custody of a known abuser. *But cf.* note 21, *infra.*

Dr. X. acknowledged that the twins had suffered traumatic losses as a result of the death, in April 1999, of their grandmother and of the disappearance, a few months later, of their mother. In Dr. X.'s view, however, grief from the loss of a loved one tends to produce depression or related disorders, rather than the anxiety demonstrated by the respondents.[10] The latter condition, according to Dr. X., resulted from the trauma incident to their having witnessed and heard abusive conduct by their parents.

In explaining how she had reached her conclusions, Dr. X. related some statements made to her by the twins during the interview. Ty.B. told Dr. X., for example, that his earliest memory was of waking up and hearing his parents "fussin," which made Ty.B. angry and sad. Ty.B. reported nightmares about the parents' arguments. According to Dr. X., Ti.B. related to her that she had seen her father strike her mother, that her mother was crying and afraid, and that her mother seemed powerless in this situation.

E. *Other evidence.*

The District introduced into evidence, and the court admitted, five petitions by the mother and two petitions by the father seeking civil protection orders (CPOs). The District also established that in 1998, the father was convicted of domestic assault after entering a plea of guilty to that offense. As the District acknowledges, however, there was no proof that the twins were present during any of the altercations that led to the requests for civil protection orders. The District claims that if the hearsay evidence is considered, there were seven incidents of domestic

---

9. Two of the aunts were of the opinion that the father was too "harsh" with their two-year old nephew (not Ty.B.) by making him sit on the toilet until he relieved himself.

10. Specifically, Dr. X. cited Ty.B.'s speech impediment, bed wetting, and restless pacing, and Ti.B.'s tendency to feign sickness, as anxiety-related behavior not normally associated with grief.

violence witnessed by the children.[11]

F. *The trial judge's decision.*

On June 29, 2001, the trial judge issued written findings in which she summarized, and credited, the testimony of the four maternal aunts and of Dr. X.[12] The judge found that the father "subjected the respondents to emotional stress and terror when he physically assaulted their mother in [the respondents'] presence on numerous occasions." The judge concluded that the respondents were "neglected children as defined by D.C.Code § 16–2301(9)(B)." At the subsequent disposition hearing, the judge ordered that the children remain in the custody of their maternal aunt, J.D.H.-P. These appeals (one as to each child) followed.

## II.

## LEGAL ANALYSIS

A. *Admissions of a party-opponent.*

In a written order dated February 27, 2001, the trial judge explained as follows her dispositive ruling with respect to the admissibility of the maternal aunts' descriptions of the mother's out-of-court statements:

> The respondents' father ... submits that testimonial evidence of statements made by [the mother] is hearsay and should not be considered in this matter. [The father's] counsel objected to the introduction of this evidence at the fact-finding hearing. The Court considered the objections and overruled them, permitting the testimony. The Court has reviewed [the father's] pleadings, the op-

positions thereto and the applicable law, and finds that its rulings shall stand.

> The Court ruled that the relevant witness may testify to statements made to her by respondents' mother. As discussed above, [the mother] is a party to the neglect proceeding. The Court overruled the objections as an admission of party opponent. In support of his argument, [the father] states that the general rule permits out-of-court statements to be offered only against the declarant. "However, the admission of one co-party can be admitted against the other co-party where there is 'a privity of obligation or of title' between the two parties." *ITT Continental Baking Co. v. Ellison,* 370 A.2d 1353, 1357 (1977). In the present case, [the mother] and [the father] are both in privity of obligation and title as they are respondents' parents. The Court, therefore, holds that the out-of-court statements made by [the mother] are admissible non-hearsay.

■ We do not agree with this analysis. Indeed, on appeal, the District cannot and does not defend it. Rather, with commendable candor, the District acknowledges that, "[p]arty admissions are statements that are made by a party *and offered against the party.* Fed.R.Evid. 801(d)(2)." (Emphasis added). The District also explains that in order to be receivable as an admission of a party opponent, the out-of-court statement must "be made by the party *and be contrary to the party's position at trial.* United States v. McGee,* 189 F.3d 626, 631–32

11. Apparently inadvertently, the CPOs were not made a part of the record on appeal, and in light of our remand, we have not considered them. *See generally, In re L.D.H.,* 776 A.2d 570, 574 (D.C.2001) (per curiam).

12. The judge found "less persuasive" the testimony of the respondents' paternal aunt, who expressed the view that her brother was a good father. Obviously, the judge could not assess the credibility of the mother, who had disappeared and was unavailable to testify.

(7th Cir.1999)." (Emphasis added). In this case, the mother's out-of-court statements described by the maternal aunts were contrary to the non-declarant father's position, but not contrary to any position taken by the declarant mother.

Further, in its brief, the District correctly summarizes the applicable law as follows:

> As discussed above, statements by a party are admissible as substantive evidence *when offered against the party who is the declarant.* Thus, [the mother's] out-of-court statements were party admissions that could have been used against her to establish that her children were exposed to domestic violence and she was aware of that fact. The trial court, however, ruled that [the mother's] out-of-court admissions could be used against appellant [father] as well. The trial court reasoned that [the mother's] statements could be used against appellant because appellant and [the mother] were in "privity of obligation" in that they had a joint duty to parent their children. The trial court's reliance on the "privity"doctrine, however, seems to have been misplaced.

> This Court recognized in *ITT Continental Baking Co. v. Ellison,* 370 A.2d 1353, 1357 (D.C.1977), that "the admission of one co-party can be admitted against the other co-party where there is 'a privity of obligation or of title' between the two parties" or where the parties are joint tortfeasors. Latching

onto this language in *ITT,* the trial court found that appellant and [the mother] were in privity with each other because of their joint obligation to parent their children [ ]. Historically, however, the privity-of-obligation doctrine has been applied in the limited context of real or personal property transactions involving successors in title. *McCormick on Evidence,* Vol. 2 § 260, p. 161–62 (5th Ed. 1999); *Jones on Evidence,* Vol. 4, § 27.2, p. 440–41 (7th Ed. 2000); *Black's Law Dictionary* (6th Ed. 1990) ("In its broadest sense, 'privity' is defined as mutual or successive relationships to the same right of property, or such an identification of interest of one person with another as to represent the same legal right.... Thus, the executor is in privity with the testator, the heir with the ancestor, the assignee with the assignor, the donee with the donor, and the lessee with the lessor"). Appellee has been unable to find an instance where the doctrine has been extended to cover the joint obligation that parents owe their children.[13]

(Footnotes omitted; emphasis added.)

In the present case, any suggestion of "privity" between the mother and the father is especially unpersuasive. Here, the mother allegedly claimed that the father struck and abused her. She was the accuser; he was the accused. There is no privity between warring parties—between adversaries in domestic violence. To treat an accusation by the alleged victim of

---

**13.** The District went on to point out that the continuing validity of the "admissions by privity" doctrine has been called into question by the adoption of the Federal Rules of Evidence. "Neither the Fed. R.Evid. nor its legislative history make any reference to the applicability of the rule to statements of those with a privity relationship to a party. Federal courts accordingly conclude that the Fed.R.Evid. reject the

concept, a conclusion that is endorsed by leading evidence treatises." *Jones on Evidence,* Vol. 4, § 27.2, p. 441 (7th Ed. 2000). Likewise, this Court recently noted that the privity doctrine has [ ] come under attack and that, as a result, "courts generally have not admitted party admissions based solely on privity." *Puma v. Sullivan,* 746 A.2d 871, 875 n. 4 (D.C.2000).

abuse as an "admission" which may be received in evidence against the alleged abuser can find no support in reason or authority. The mother was not *admitting*, in her out-of-court statements that the father abused her; on the contrary, she was accusing the father of abuse. The District concedes, and we agree, that the trial court's dispositive ruling was not correct.

*B. Preservation of the issue.*

▮ The District claims that the father failed to preserve his hearsay claim with respect to a number of out-of-court declarations attributed to the mother by the maternal aunts. We note at the outset that in the passage from her order quoted above, the judge herself stated that she had admitted the evidence over objection. In any event, we are satisfied that the hearsay objection was properly made and preserved.

At the beginning of the testimony of J.D.H.-P., the first maternal aunt to take the witness stand, counsel for the District asked the witness to relate a conversation that she claimed to have had with the mother in which the mother allegedly described her relationship with the father. The following exchange ensued:

> MR. HARRIS [Counsel for the father]: Your Honor, I'm going to object. This would be hearsay.
>
> THE COURT: Government, I'll hear your brief response.
>
> MS. LEVITT [Counsel for the District]: Your Honor, this is a statement of the party and clearly that's the (indiscernible).

> THE COURT: Any response? These are civil proceedings in nature. The Court notes that mother is a party, the Court would overrule the objection.

Shortly thereafter, in relation to another out-of-court statement by the mother, the father's attorney stated, *inter alia:* "I don't believe that they're party opponents ...." The judge responded:

> ... The Court overrules the objection with respect to hearsay. The Court has already ruled upon that.

*Id.* at 23.

Counsel's objections were sufficient to preserve the father's claim that the evidence was inadmissible hearsay. In *District of Columbia v. Wilson,* 721 A.2d 591, 601 n. 18 (D.C.1998), we reiterated the principle that a party's

> "failure to object may be disregarded if the party's position has previously been clearly made to the court and it is plain that a further objection would be unavailing." *Thoma v. Kettler Bros., Inc.,* 632 A.2d 725, 727 n. 3 (D.C.1993) (quoting 9 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2553, at 639–40 (1971)).

In this case, the judge had emphatically made her position clear. Indeed, she had implicitly reproved the father's counsel for raising the point again: "The Court has already ruled upon that." To require counsel for the father to object again would be "to require a pointless formality." *Wilson,* 721 A.2d at 601 n. 18 (quoting *Brown v. AVEMCO Investment Corp.,* 603 F.2d 1367, 1371 (9th Cir.1979)).[14]

---

14. The District also argues that "the court should decline review of appellant's claims because they are not properly presented on appeal." Urging us to recognize that "[j]udges are not like pigs, hunting for truffles buried in briefs," *Carpenter v. Vaughn,* 888 F.Supp. 635, 648 (M.D.Pa.1994), and that

"[i]t is not this court's responsibility to research and construct the parties' arguments," *United States v. Lanzotti,* 205 F.3d 951, 957 (7th Cir.2000), the District claims that the father's brief does not adequately identify either the hearsay statements which are claimed to have been erroneously admitted or

The District also asserts that the father cross-examined the maternal aunts regarding the mother's out-of-court statements and thereby waived his hearsay objection to these statements. In this case, however, the hearsay statements represented the principal proof of domestic abuse by the father. If we were to treat cross-examination of the aunts with respect to the mother's statements as a waiver, then, to resort to the vernacular, the father would find himself between a rock and a hard place. The father's attorney would be compelled either to leave damaging testimony against his client uncross-examined after it had been admitted by the court, or to waive his underlying (and, we think, sound) hearsay objection. We do not think it reasonable to put the father to such a choice.[15]

### C. Hearsay exceptions.

■ Although the judge was of the opinion that the mother's statements to the maternal aunts were not hearsay, she also ruled, in the alternative, that the statements were admissible under hearsay exceptions for "state of mind," for "excited utterances" and for "present sense impressions." In the written order in which she addressed evidentiary issues, the judge ruled, *inter alia,*

1. that "[the mother's] state of mind regarding domestic disputes with [the father] [was] relevant to the underlying issue of whether respondents [were] neglected children under the statute";

2. that because the mother's discussions with the aunts of altercations with the father occurred shortly after those altercations, "those statements [were] admissible as excited utterances or under the present sense impression exception to the hearsay rule";[16]

3. that the twins' statements regarding their parents' fighting or yelling and screaming "fall under both the state of mind or spontaneous utterance exceptions to hearsay . . . ."

■■ These rulings came *after* the evidence had been admitted on the theory that the mother's out-of-court statements were not hearsay at all, and the District never proffered the statements under any of these hearsay exceptions. No foundation was laid for the application of any of the exceptions, and the father never had the opportunity to contest their applicability. "The law is clear that the [District]

the portions of the record on which the father relies. Although greater clarity with regard to both points might have been helpful, we read the father's brief as claiming that out-of-court statements by the mother and by the respondents were hearsay and should not have been received in evidence, and that without the hearsay the District's claim must fail for lack of proof.

Further, in the father's statement of the questions presented for review, the first issue is described as follows:

1. Whether the trial court erred in admitting various hearsay evidence which suggested that [the father] had committed acts of domestic violence.

In so framing the issue, the father's counsel was obviously referring to the very evidentiary question addressed in this opinion.

**15.** This is not a case like *Mack v. United States,* 570 A.2d 777, 778 n. 1 (D.C.1990), or other authorities relied on by the District, in which, for tactical reasons, the father's attorney sought to turn the hearsay evidence to the father's advantage rather than to exclude it. In this case, having failed to have the hearsay excluded, counsel resorted to a largely unsuccessful exercise in damage control.

**16.** Although a few of the mother's out-of-court statements reported by the maternal aunts were made on the telephone during or immediately after the domestic violence, others were made long after the fact. It does not appear that in making her "excited utterance" or "present sense impression" rulings, the judge distinguished between these two categories of out-of-court declarations.

and the trial court, not the ... appellant, had the legal responsibility to clarify the basis for admitting testimony, over objection, that otherwise was inadmissible hearsay." *Patton v. United States*, 633 A.2d 800, 809 (D.C.1993) (per curiam). Moreover,

> on proper objection it is clearly the burden of the party seeking its admission, to identify the appropriate exception and to demonstrate that the testimony fell within it. And it is the trial court's responsibility to examine the testimony and determine whether the proper foundation has been laid for the exercise of discretion as to its admission.

*Id.* at 810 (emphasis in *Patton*) (quoting *In re M.L.H.*, 399 A.2d 556, 558 (D.C.1979)). In this case, as in *M.L.H.*, "[t]he [District] never identified a hearsay exception for the trial court to review." 399 A.2d at 558. Instead, the judge made the hearsay exception rulings after the fact, without a foundation having been laid, and without the father having had the opportunity to challenge any premise on which the admission of the statements under any hearsay exception may have been based.

▌ Further, on the merits, we do not agree that evidence that the father abused the mother could properly be admitted to show the mother's state of mind; the judge cited no authority for this proposition, and the District does not defend this aspect of the judge's ruling. Most of the mother's statements to and conversations with the maternal aunts regarding abuse by the father were not made contemporaneously with the events, and therefore were not admissible under the "present sense impression" exception. *See Hallums v. United States*, 841 A.2d 1270, 1277–78 (D.C.2004) ("[T]he court must be assured that the statements sought to be admitted were made spontaneously *and contemporaneously with the events described*") (emphasis added; citations and internal quotation marks omitted).[17] Although some of the out-of-court statements by the mother and by the children could conceivably have been admissible as excited utterances, *see, e.g., Malloy v. United States*, 797 A.2d 687, 690 (D.C.2002); *Stancil v. United States*, 866 A.2d 799, 807–09 & n. 19 (D.C.2005), they were not offered as falling within that exception to the hearsay rule, and no foundation was laid. We therefore cannot agree with the judge's sweeping retroactive ruling that all of the out-of-court statements by the mother fell within this exception. Indeed, on the record as it stands, and without further elaboration, none of these statements could properly be admitted as an excited utterance.

Insofar as the trial judge was relying on the testimony of Dr. X. for her conclusion that statements of the twins were admissible as excited utterances to show fighting between the parents and abuse by the father, the judge's reliance was misplaced. We recently stated in *In re C.A.S.*, 828 A.2d 184 (D.C.2003):

> Although *the doctor* was entitled to rely on the children's out-of-court statements about the beatings to form a basis for her opinion, *the court* could not consider those statements to prove the truth of what they asserted—i.e., that the children actually saw their father beating their mother.

*Id.* at 191–92. The same reasoning applies here.

17. To the extent that some of the mother's statements to the aunts (*e.g.,* night time telephone calls when the father and mother were fighting and the police were called) might have qualified as falling under the "present sense impression" exception, they were not so introduced and no foundation was laid.

### D. *Harmless error analysis.*

The District suggests, and our dissenting colleague would hold, that a substantial amount of domestic abuse was established by admissible evidence, that the admissible evidence was sufficient to support the finding of neglect, and that any error in receiving hearsay evidence was therefore harmless. We agree with the District's premise, but not with its conclusion.

In *R. & G. Orthopedic Appliances and Prosthetics, Inc. v. Curtin,* 596 A.2d 530, 538–40 (D.C.1991), this court considered the standard for harmless error applicable to civil litigation. We quoted from the seminal case of *Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), a criminal appeal, as follows:

> If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress .... But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected.

*R. & G.,* 596 A.2d at 539. We further recognized in *R. & G.* that while,

> in the crunch, error that might be harmless in a civil case could be held prejudicial in a criminal prosecution in which the defendant's personal liberty is on the line, we agree that "the general discus-

sion [in *Kotteakos*] of the attitude that judges should take seems fully applicable to civil litigation."

*Id.* at 540 (quoting 11 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2883, at 276 (1973 & 1991 Supp.)).

In the present case, we are unable to say with "fair assurance" that the reception of hearsay evidence did not substantially affect the result. All four aunts testified to out-of-court statements by the mother attributing abusive conduct to the father. The hearsay thus accounted for the greater part of the District's evidence, and without it, the record would have been entirely different. It may be that an impartial trier of fact *could* reasonably have found for the District if the hearsay had been excluded. But where, as in the District's case here, the inadmissible predominated over the admissible, the judgment cannot stand.

It may be that the non-hearsay evidence introduced by the District would have been sufficient to sustain the finding of neglect, but that is not the question before us. In *Williams v. Zahradnick,* 632 F.2d 353 (4th Cir.1980), the court explained the difference between sufficiency of the evidence and the determination whether particular error is harmless:

> With respect to the sufficiency of the evidence, it should be emphasized that the sufficiency issue is distinct from that of harmless error. Evidence may be sufficient to sustain a conviction yet may be so thin that it will not render the error harmless.

*Id.* at 364; *see also Fox v. United States,* 421 A.2d 9, 14 (D.C.1980).[18] Accordingly,

---

18. In *Fox,* this court recognized the same distinction as was made in *Williams:*

> We are satisfied that this evidence was sufficient to permit a guilty verdict. We do not, however, find the evidence so strong as

to justify a conclusion that the erroneously admitted hearsay testimony was harmless in its impact on the jury deliberations. Whether, absent this item of evidence, a jury would nonetheless convict appellant is

"analysis under the harmless error doctrine should not be limited to superficial inquiry as to whether the same verdict would have been possible absent the tainted evidence." *[Raymond] Brooks v. United States*, 367 A.2d 1297, 1309 (D.C.1976); *see also Clark v. United States*, 593 A.2d 186, 192 (D.C.1991). To conclude that an error is harmless, we must find it *"highly probable* that [that] error did not contribute to the verdict." *United States v. Tussa*, 816 F.2d 58, 67 (2d Cir.1987) (emphasis added) (quoting *United States v. Corey*, 566 F.2d 429, 432 (2d Cir.1977)); *Clark*, 593 A.2d at 192. "[W]e must determine whether the error was *sufficiently insignificant* to give us *fair assurance* that the judgment was not substantially swayed by it." *[Reginald B.] Brooks v. United States*, 599 A.2d 1094, 1102 (D.C.1991) (emphasis added) (citing *Kotteakos*, 328 U.S. at 765, 66 S.Ct. 1239). "The infusion of 'harmlessness' into error must be the exception, and the [harmless error] doctrine *must be sparingly employed.*" *Clark*, 593 A.2d at 192 n. 8 (emphasis added) (quoting *Chapman v. United States*, 547 F.2d 1240, 1250 (5th Cir.) (per Irving Goldberg, J.), *cert. denied*, 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1977)); *[Reginald B.] Brooks*, 599 A.2d at 1102 (quoting *Clark*, 593 A.2d at 192 n. 8). Thus, even where there is sufficient admissible evidence to support the judge's finding, we cannot treat the erroneous admission of hearsay as harmless unless the error was so inconsequential as to provide reasonable assurance that it made no appreciable difference to the outcome.

This is not a case in which the error in admitting hearsay testimony may fairly be characterized as "insignificant," nor is it "highly probable" that the hearsay did not appreciably affect the result. It was the out-of-court statements by the mother to the aunts that contained, and conveyed, the gravamen of the District's case. The inadmissible hearsay illuminated and gave meaning to the direct evidence, such as the bruises on the mother's body and the broken furniture which the aunts personally observed. Moreover, comparatively little of the non-hearsay testimony related to events that occurred in the presence of the twins. We are therefore satisfied that the "fair assurance" required by *Kotteakos* is not present here. We note that neither the District nor our dissenting colleague has cited any decision, and we know of none, in which we have found harmless error where the testimony which should have been excluded was as central to the appellee's case, and as pervasive, as in the record presently before us.[19]

## III.

## CONCLUSION

For the foregoing reasons, the decision of the trial court is reversed, and the case is remanded for further proceedings consistent with this opinion.[20]

a speculation which we are neither prepared nor willing to undertake. *Id.* at 14.

19. The appropriate placement of the respondents, pending the completion of further proceedings pursuant to our remand, is confided to the discretion of the trial court. Nothing in this opinion is intended to address that question.

20. Because the issue may arise on remand, we note that if Dr. X.'s testimony is taken to its logical conclusion, then any parent who has ever abused his or her spouse or paramour in the presence (or within the hearing) of the children would *automatically* be barred from being awarded custody, regardless of the circumstances. Although domestic violence is obviously a very important factor in assessing the best interests of the child, any absolutist position must be assessed with some caution. "State intervention in the lives of families does not come without cost to the child." *In re S.K.*, 564 A.2d 1382, 1390

REID, Associate Judge, dissenting:

This is not a constitutional error case. Nor is it a jury case in which the trial court erroneously instructed the jury. Rather, this case involves some instances where the trial court erroneously applied principles governing exceptions to the hearsay rule. Therefore, the ultimate question is whether the trial court's error was harmless. We articulated the proper standard of review for this case in *Robinson v. United States*, 623 A.2d 1234 (D.C. 1993):

> [T]he appropriate test for reversible error is the standard set forth in *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). *See White v. United States*, 613 A.2d 869, 874 (1992). Thus, we must decide whether we can " 'say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.' " *Id.* (quoting *Kotteakos*, 328 U.S. at 765, 66 S.Ct. 1239). Under this standard "we must find it 'highly probable that [that] error did not contribute to the verdict.' " *Clark v. United States*, 593 A.2d 186, 192 (D.C.1991) (quoting *United States v. Tussa*, 816 F.2d 58, 67 (2d Cir.1987)).

*Id.* at 1243; *see also United States v. Corey*, 566 F.2d 429, 432 (2d Cir.1977) ("A nonconstitutional error, as in the case of erroneous admission of similar act evidence, is harmless if it is 'highly probable' that the error did not contribute to the verdict.") (citations omitted). On the record before us and given the issue in this case, I cannot agree with my colleagues' determination that: although "it may be

that an impartial trier of fact *could* reasonably have found for the District if the hearsay had been excluded[,] ... where, as in the District's case here, the inadmissible predominated over the admissible, the judgment cannot stand." I am not persuaded that "the inadmissible [evidence] predominated over the admissible," and I am convinced that "an impartial trier of fact [could] reasonably have found for the District if the hearsay had been excluded." Furthermore, I can "say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error," and that "it [is] 'highly probable that [the error] did not contribute to the [trial court's judgment]." *Robinson, supra,* 623 A.2d at 1243.

In essence, the central issue in this case was whether the domestic violence in the home of Ty.B. And Ti.B. prevented them from receiving "proper parental ... care or control necessary for [their] ... mental, or emotional health ..." and thus rendered them neglected within the meaning of D.C.Code § 16–2301 (9)(B). Indeed, the government's theory of the case, stated during opening argument, was that the "children were neglected by having been severely emotionally abused in the home where they were subjected to ongoing constant ... domestic violence since the ... date they were born...." The record reveals substantial nonhearsay evidence to support the government's theory of the case.

I begin with the context under which this neglect proceeding unfolded, commencing in March 2000 when the District

---

(D.C.1989) (concurring and dissenting opinion) (citations omitted). In some instances, there may be no satisfactory alternative caretaker. We have held that whether abuse of one child constitutes neglect of his or her

sibling depends upon the circumstances of the particular case. *See, e.g., In re Te.L.*, 844 A.2d 333, 339–40 (D.C.2004). The same principle might logically be applied to the kind of situation presented in this case.

government filed a neglect petition pertaining to Ti.B and Ty.B., then six-year-old twins. Y.B., the children's biological mother and T.B., their biological father who was not married to Y.B., had lived together during much of the children's existence, but they had a very stormy relationship marked by violent confrontations requiring, at times, the presence of the police. In August 1999, Y.B. disappeared and eventually was presumed dead.

At the time of the hearing on the neglect petition, an investigation into Y.B.'s disappearance was in progress. T.B., a party to the neglect proceeding, was a suspect in Y.B.'s disappearance, and had been ordered by law enforcement authorities to appear to give blood. Consequently, tension existed between the criminal investigation and the neglect proceeding because T.B.'s constitutional criminal procedural rights had to be safeguarded while the trial court attempted to hear and consider evidence in the neglect proceeding relating to the welfare of Ti.B. and Ty.B. In fact, the neglect proceeding was interrupted because of an interlocutory appeal filed in this court concerning T.B.'s right to criminal counsel, in addition to neglect counsel. This court held "that the trial court abused its discretion in excluding [criminal counsel for T.B.] from the [neglect] courtroom, and in prohibiting T.B. and his [neglect counsel] from conferring with [criminal counsel] about the neglect proceeding." *In re Ti.B, Ty.B.*, 762 A.2d 20, 33 (D.C.2000). Even when the neglect case resumed following resolution of the interlocutory appeal, the tension continued between T.B.'s Fifth Amendment right to invoke the privilege against self-incrimination and the prosecution of the government's case in the neglect proceeding.

In addition to questions governing T.B.'s assertion of his constitutional privilege against self-incrimination, the trial judge had to handle numerous hearsay objections during the course of the proceedings. The court sustained some of those objections and overruled others. As the majority points out, some of the overruled objections on hearsay grounds should have been sustained,[1] but that fact alone does not require reversal and remand of this case.

T.B. mainly argues that "[t]here was no direct evidence that T.B. initiated the arguments and/or altercations between he [sic] and Y.B., the children's mother. The only evidence presented regarding the alleged altercations was hearsay." In addition, he maintains that "[t]here is no evidence that T.B. neglected or abused the children in any of the myriad of usual forms of conduct familiar in these types of cases, physical abuse, verbal abuse, failure to provide for needs, etc." He also challenges the expert's testimony.

My reading of the record shows substantial non-hearsay testimony which the trial court credited and reasonable inferences to support the government's case. After receiving a call around 3 a.m. in January or February 1995, from Y.B., J.H.–P., one of her sisters, went to her Y.B.'s house to pick up Ti.B. and Ty.B. Y.B. was "[di]sheveled and ... injured." Bruises were "on her arm." She was in a wheelchair because of an ankle injury "or something." J. H.–P. noticed "several articles of furniture broken." "[T]hings were tossed around" in the upstairs bedroom. T.B. was present. Again, in late 1995, or early 1996, J.H.–P. received a call from Y.B. When she arrived, the police were present and in the process of removing both T.B.

---

1. Or, the objections could have been overruled on the basis of proper and applicable exceptions to the hearsay rule.

and Y.B. from their home. Y.B. was "in an agitated state, ... upset ...." "The house was a mess, ... things were thrown around, knocked over." And, in 1998 in the "late evening," after receiving a call from Y.B. who was at their mother's house, J.H.–P. went to her mother's home where she saw Y.B. Y.B.'s "braids [had been] pulled out, she had a, a bald spot on her head where the braids had been pulled out."

N.H., another of Y.B.'s sisters, testified that while Y.B. was pregnant with the twins, she went to the hospital because Y.B. was there. Y.B. "was badly shaken up, had been crying, scared." Around July 1999, Y.B. ran into N.H.'s home with the twins; at the time T.B. was under an order to stay away from Y.B. Y.B. was "very upset and nervous." The children acted "scared" and "ran in and stood behind their mom." T.B. "came in" and N.H. asked, "what's going on...." T.B. replied: "[S]he keeps messing with me, I'm gonna hurt her ...." T.B. was "[y]elling, yelling, just angry." He also told Y.B., "I want you to drop the status ... on the child support and you're gonna move out the house. If I can't live in it, can't nobody live in it." N.H.'s son asked T.B. to leave, and eventually he exited N.H.'s home.

Yet another of Y.B.'s sisters, S.G. testified that in December 1997, around 7:00 or 8:00 p.m., she was standing outside her mother's home with her mother and Y.B. when T.B. appeared. T.B. was angry, spoke loudly and was arguing with Y.B. The women asked T.B. to leave but "he proceeded to come forward toward [them]." S.G. had a car club, used to secure the steering wheel, in her hand. "As [T.B.] started coming closer to [the women], [S.G.] showed him the club and told him, just leave." T.B. kept advancing and took a piece of the club from S.G.'s

hands. S.G.'s mother went to call the police. T.B. "proceeded to leave [b]ut, before he left ...[, he] threw that piece of the club and it went into [the] windshield wiper [of Y.B.'s car] .... It broke through the glass and it sort of just stayed inside the glass." Y.B. and S.G. "both were standing beside the car." During the episode, T.B. used "[l]ots of profanity and at one time ..., he threatened [Y.B.]. He said, I'm going to kick your ... ass .... [S]top f'ing with me."

A fourth sister, A.F., gave testimony during the neglect proceeding. Accompanied by her husband and five children, A.F. went to Adventure World with Y.B., T.B. and the twins. There, A.F. watched while T.B. "got loud" and "grabbed [Y.B.'s] arm." He complained that she was not spending time with him at Adventure World. "[H]e started shoving her and shoving her," and he was "pulling her and shoving her." T.B. was "angry." Soon, T.B. "got in his car and just left ... the children and [Y.B.] in the park."

Dr. X, a child clinical psychologist, testified in behalf of the government. Beginning in the late 1980s, she had completed "[q]uite a bit of research on the impact of witnessing violence on young children, on pre-school age and elementary school children," from age five through the adolescent years. Her studies, which were published in such journals as the Journal of the National Medical Association and the Journal of Community Psychology, and in a book published by the American Psychological Association, included an examination of "children who witness trauma at home." Her general focus was the impact of such trauma on these children's "social and emotional development both in the short-term and the long-term." She estimated at the time of trial that she had studied "about 3,000" children, mainly in the District of Columbia. She had pre-

sented her findings at professional conferences both nationally and internationally.

Her studies found that for children, "witnessing violence ... can be as detrimental as actually being a victim [of] physical violence ...," that "witnessing someone else beaten, for instance a parent, ... is as psychologically damaging and can produce the same kind of mental health disorders ... as if that child had actually been the victim of physical violence." Children who witness violence in the home also may suffer from clinical depression and post-traumatic stress disorder. And, "the earlier the trauma is witnessed the more deleterious [is] the effect on the brain ...."

According to Dr. X, Ti.B. and Ty.B. have been exposed to "multiple stressors," including domestic violence, a missing mother, and a mother presumed to be dead. Both children were "impacted by the stress and anxiety around violence in the home." The male twin "has real clear signs of post-traumatic stress disorder ... in terms of the nightmares that he experiences." Besides nightmares, he has "difficulty focusing and restlessness, pacing." In addition, he "has difficulty with anxiety" and "a speech impediment" which is "an anxiety reaction." Anxiety disorders cannot be cured quickly; some "fight these kind of anxiety disorders for years." Post traumatic syndrome disorder is associated with a "real chemical imbalance" that affects the brain. The male twin "particularly [is] in a very precarious situation" and reflects emotions of "anger and sadness" with the same "affect" or "emotional expression." Dr. X noted that "already, there are some concerns about the [male twin's] behavior in school in terms of hitting girls or fighting girls," and also children who come from a history of domestic violence in the home have difficulty "concentrat[ing] on math and arithmetic in

school." The female twin manifested post traumatic syndrome disorder in other ways. She "complain[ed] of being sick with no overt illnesses." In addition, "[s]he has some anxiety, nervousness, she bites her finger nails and she then has crying spells for no apparent reason."

Dr. X further explained that for children who witness battering, "it's the unpredictability of the situation that primes [them] for the stress and makes it difficult for them to let go of some of these trauma behaviors." Moreover, "kids who witness violence live with fear." This does not mean that they are "terrified 24 hours a day but it's like living with the sense of fear, unpredictability and anxiety. But most of all, especially for boys, it's feeling powerless that you can't do one thing about it." Instead, they "can go to school and take it out on a little girl." They have "to do something with that rage and anger." Dr. X concluded that the twins "have been exposed to violence and they have been damaged socially and psychologically by that." Dr. X was certain about the damage, asserting that "[t]here's no question about that." On cross-examination, Dr. X fielded a number of questions designed to determine whether the twins' behavior, such as the female twin's crying spells or the bed wetting by the male twin, could be attributed solely to the death of their grandmother or the loss of their mother rather than to witnessing domestic violence. Dr. X responded in principal part:

Any one of these [behaviors] individually could occur in any day of the week. But it is the length of time they have occurred and it is their occurrence together that makes one look at a syndrom[e] that is an anxiety related syndrom[e]. There are certain constellation of behaviors in children that occur after death. And one of them is potentially bed wet-

ting because it's a regressive behavior. But you generally don't see a constellation of anxiety related disorders that occur after a death. And in [the male twin], it's pacing around that's anxiety related. It's nightmares that's anxiety related. It's nervousness, fidgeting that's anxiety related.

Dr. X added:

[U]sually when youngsters have an anxiety disorder or certainly post-traumatic stress disorder [("PTSD")], they have been actually exposed to trauma. Meaning that they have seen or witnessed something that is so different, unusual, frightening, scary, out of the ordinary, not just a stressful event. For instance, a death of a grandmother, usually kids don't get PTSD from the death of a grandmother or even the death of a parent unless the parent died in a traumatic way. So hearing about a mother's death, yes children can have a number of negative behaviors, the bed wetting for instance would be a common symptom that you might see after the death of a parent but not a speech impediment. Not those whole series of anxiety related behaviors.

In short, Dr. X emphasized that the twins have "had a lot of stress," and "very clear signs of trauma." But the behavioral constellation manifesting the anxiety related syndrome of post traumatic stress disorder in this case is attributable to witnessing domestic violence.

On the bright side, the twins are functioning well now. Dr. X attributed this to "a really supportive family in [the custodial aunt's] family." When Dr. X watched the twins interact with that family, they "seemed at ease, they seemed happy." The twins' extended family consisting especially of "their cousins and [another] aunt" constituted a source of comfort and "a very healing experience" for the chil-

dren. In response to a question relating to "children and their relationship with the parent that has been identified as the abusive parent," Dr. X stated:

[T]he very critical issue here is that a number of professional organizations including the National Council of Juvenile and Family Court Judges have come out with various rulings that are backed up by empirical research, that recommend that one should not give sole custody or joint custody to a known abuser at any point. And this finding has been backed up by a number of the major psychological associations and child organizations.

This position has been taken, in part also, because "[t]he research has found that many men do not really consider domestic violence a crime," and even some of those who do and who "go to treatment for a little while ..., are back doing it" to the same person or to another. While the twins visited their father every Monday, neither twin "express[ed][a] desire to be in a more permanent situation with the father."

T.B., the children's biological father, also testified at the hearing on the neglect petition, on three different days. At the direction of one of his lawyers, he frequently asserted his Fifth Amendment privilege against self-incrimination. He was able to respond to some questions. He maintained that he had never been married and on the first day of his testimony described care relating to schooling and medical needs that he had provided to his children. During cross-examination on the second hearing day he acknowledged that he had appeared in court on a child support matter. On the third day of testimony, the court took judicial notice of all court records pertaining to Y.B. and T.B. These records consisted of civil protection orders, a petition for custody, T.B.'s misdemeanor criminal conviction for domestic assault,

1273

and Y.B.'s petition for paternity and support. On the third day of the hearing, T.B. also answered some questions relating to support he had provided to his children. At the time, he had resided with a male friend in a two bedroom townhouse for approximately one year. He alleged that his children were "kidnaped" by Y.B. and declared that he would not pay a kidnapper. He accused Y.B. of "tearing" the children's shoes up or "destroy[ing] them."

T.B.'s sister, L.W., also testified in T.B.'s behalf. Prior to July 1999, she saw T.B. with his children "once, twice, three times a week usually." She rarely went to T.B.'s home. So she saw T.B. and his children mainly when they paid a one half hour visit to her home. She described T.B. as a "[v]ery attentive, loving father." She did not see Y.B. "too often." Sometimes T.B. stayed with L.W. "[b]ecause he had a stay away order from his home," that is, an order to stay away from Y.B.

Based upon the non-hearsay testimony of J.H.-P., N.H., S.G., and A.F., there was substantial evidence of domestic violence in the presence of the children, both direct and that based upon reasonable inferences. On top of this substantial evidence, the testimony of Dr. X pertaining to the impact witnessing domestic violence could have on children in general, and the impact it had on Ti.B. and Ty.B. in particular was compelling, even without considering what the children told Dr. X about the domestic violence that they witnessed. The trial court credited Dr. X's testimony. And, the trial court took judicial notice of several civil protection orders, four of which were filed by Y.B. in 1993, 1995, 1996, and 1998, and two of which were lodged by T.B. in 1994 and 1998.

Given this record of compelling, substantial and competent evidence, I am satisfied that the trial court did not commit reversible error by admitting certain hearsay testimony into evidence. I can "say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the [trial court's] judgment was not substantially swayed by [its] error," and in my view, "it [is] 'highly probable that [the] error did not contribute to the verdict.'" *Robinson, supra,* 623 A.2d at 1243 (citations omitted); *Corey,* 566 F.2d at 432.